Docket No. 100914.

# IN THE
# SUPREME COURT
# OF
# THE STATE OF ILLINOIS

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v.
DEREK M. LUEDEMANN, Appellee.

*Opinion filed October 5, 2006.*

CHIEF JUSTICE THOMAS delivered the judgment of the court, with opinion.

Justices Freeman, Fitzgerald, Kilbride, Garman, and Karmeier concurred in the judgment and opinion.

Justice Burke took no part in the decision.

## OPINION

Defendant, Derek M. Luedemann, was charged with driving under the influence of alcohol (DUI) (625 ILCS 5/11–501(a)(2) (West 2002)) and illegal transportation of alcohol (625 ILCS 5/11–502(a) (West 2002)). In a separate case, defendant was charged with unlawful possession of a controlled substance (a methylenedioxy amphetamine derivative) (720 ILCS 570/402(c) (West 2002)). Defendant moved to quash his arrest and suppress evidence in both cases. Additionally, he petitioned to rescind the statutory summary suspension of his driver's license. The basis for the motions was that there was no warrant for his arrest and that the arresting officer had neither probable cause nor a reasonable articulable suspicion that defendant was engaged in criminal activity.

In the DUI case, the circuit court of Kane County granted both the motion to suppress and the petition to rescind the statutory summary suspension. Defendant then moved in the controlled substances case to bar the State from contesting the motion to suppress. The trial court granted the motion, ruling that the State was collaterally estopped from contesting the motion to suppress. The State filed a certificate of impairment and appealed, arguing that the trial court in the DUI case erred in granting the motion to suppress and that the trial court in the controlled substances case erred when it granted the motion to collaterally estop the State from contesting the motion to suppress. The appellate court, with one justice dissenting, affirmed in part and vacated in part. 357 Ill. App. 3d 411. In the DUI case, the appellate court affirmed the trial court's granting of the motion to suppress. However, the court also held that the State was not collaterally estopped from contesting the motion to suppress in the controlled substances case because, at the time the trial court made the collateral estoppel ruling, the trial court's decision in the DUI case was on appeal and not yet final. 357 Ill. App. 3d at 426. We allowed the State's petition for leave to appeal. 177 Ill. 2d R. 315.

BACKGROUND

Officer Eric Pate of the Hampshire police department was the sole witness to testify at the hearing on defendant's petition to rescind the statutory summary suspension of his driver's license, and Officer Pate's testimony was also considered by the trial court in ruling on defendant's motion to suppress in the DUI case. Officer Pate testified that he was on patrol in a residential neighborhood on August 17, 2002, at approximately 2:40 a.m. He was driving west on Julie Street when he saw defendant sitting in the driver's seat of a car parked in front of 305 Julie Street. The car was legally parked and facing east. Officer Pate noticed that defendant was smoking a cigarette. As Officer Pate's car came closer to defendant's, he saw defendant reach toward the floorboard on the passenger side of the car. Officer Pate's car was approximately 25 to 30 feet away from defendant's car at this time. Defendant then returned to a seated position, and, as Officer Pate's car approached, defendant slumped down approximately six to eight inches in his seat.

Officer Pate drove past defendant's vehicle and parked in the center of the street, with his car still facing west. Officer Pate exited his vehicle and approached defendant's car from the rear driver's side. Defendant had his window rolled down, and he was listening to the car's stereo. As Officer Pate approached, defendant turned off the car's engine. Officer Pate had not asked him to do so. When Officer Pate was at the rear quarter panel of the vehicle, he noticed the neck of a brown glass bottle. The bottle was on the floor in front of the passenger seat. Officer Pate could see the top two or three inches of the bottle because he was illuminating the vehicle with his flashlight. Officer Pate noticed that the bottle was uncapped. Officer Pate asked defendant what he was doing there, and he also asked for defendant's identification. Defendant provided his identification and explained that he was waiting for his girlfriend to return home. Defendant pointed to his girlfriend's house but said that he did not know the address. Officer Pate explained that he had decided to question defendant about what he was doing because within the last week there had been vehicles damaged and three homes burglarized on Julie Street. The burglaries occurred between 5 p.m. and 8 a.m. However, the police had no description of the perpetrator or of the perpetrator's vehicle.

While Officer Pate was speaking to defendant, he noticed that defendant's speech was slurred and that his eyes were bloodshot and glassy. Additionally, Officer Pate could smell alcohol on defendant's breath. Because Officer Pate observed signs of intoxication, he radioed for another officer to join him. Officer Pate then pulled his squad car directly behind defendant's car and activated his car's videotape system. Officer Harris arrived on the scene, and the two officers approached defendant's vehicle, one on each side. Harris found an open Miller Lite bottle on the floor of the passenger side of defendant's vehicle, in the same spot where Officer Pate had previously noticed an open bottle. Officer Pate asked defendant to step out of the vehicle. Officer Pate then asked defendant if he could pat him down for weapons, and defendant agreed. Officer Pate found no weapons. He then instructed Officer Harris to remove the bottle from the vehicle. Harris said that the bottle was one-third full and cool to the touch. Officer Pate could see condensation on the bottle.

Defendant admitted that he had been drinking, and he agreed to perform field sobriety tests. Defendant subsequently failed the

horizontal gaze nystagmus test, the nine-step walk-and-turn test, the one-leg stand test, and the finger-to-nose test. Officer Pate then told defendant that he believed defendant was under the influence of alcohol, and he placed defendant under arrest. Defendant protested that he had been parked, and Officer Pate explained to him that he had been in physical control of a motor vehicle. After defendant was arrested, the officers searched his vehicle and found a substance containing a methylenedioxy amphetamine derivative.

At the close of Officer Pate's testimony, the circuit court granted the petition to rescind the statutory summary suspension. The court found that Officer Pate had neither probable cause for an arrest nor a reasonable suspicion of criminal activity sufficient to justify a *Terry* stop. The State moved to reconsider, arguing that the court's ruling was erroneous because Officer Pate did not seize defendant until after he observed signs of intoxication. The State cited cases holding that the police do not violate the fourth amendment merely by approaching a person in public and asking him questions. See *Immigration & Naturalization Service v. Delgado*, 466 U.S. 210, 216, 80 L. Ed. 2d 247, 255, 104 S. Ct. 1758, 1762 (1984); *People v. Love*, 199 Ill. 2d 269, 278 (2002). Thus, according to the State, Officer Pate was entitled to approach defendant and ask him questions, provided that he did not make a show of authority sufficient to transform the encounter into a seizure. The State argued that no seizure occurred until Officer Pate asked defendant to step out of the car and, at that time, a *Terry* stop was warranted because Officer Pate had a reasonable suspicion that defendant was intoxicated while in control of a motor vehicle. Alternatively, the State argued that, even if Officer Pate did seize defendant prior to asking him to step out of the vehicle, defendant's behavior was sufficiently suspicious to justify a stop under *Terry*. The circuit court denied the motion in a written order, without comment.

Relying on the findings it made in granting the petition to rescind the statutory summary suspension, the circuit court later granted the motion to quash arrest and suppress evidence. The State moved for more detailed findings, arguing that the court's findings were insufficient in that there were no findings of fact or any determination as to when the stop occurred. The State also moved to reconsider the order quashing arrest and suppressing evidence.

At a hearing on the State's motions, the circuit court agreed to make more detailed findings. The court stated the following for the record:

"As I review the transcript the first witness to testify was Officer Eric Pate of the Hampshire police department. Officer Pate's testimony from Page 6 through Page 11 essentially says that he was driving his car and he saw a person sitting in a parked car smoking a cigarette, and that he saw him lean forward and then ultimately slouched down a little bit. And on that basis he made a U turn, pulled in behind him and essentially conducted a stop.[1]

The Court finds, for the record, that on that basis Officer Pate, using good policeman intuition, stopped the vehicle. But in fact, his intuition, while ultimately turned up something, was really nothing more than a hunch. And I think as I stated at the time in Terry versus Ohio and as that case has been synthesized by the Second District, a hunch is not enough.

So, with regard to a more detailed finding, the court finds that Officer Pate's testimony is pretty straightforward and that he was operating, my view of his testimony was he was operating on a hunch. Now, that hunch turned out to be something that all policemen hope that their hunches turn out to be, but it was nothing more than a hunch."

Following arguments on the State's motion to reconsider, the court entered a written order denying the motion. That order stated:

"THIS CAUSE, coming on for ruling on the state's motion to reconsider the order to quash arrest and suppress arrest [*sic*]; and

---

[1]The circuit court misread the transcript. Officer Pate did not conduct a U-turn and pull in behind the defendant at this time. Rather, Officer Pate parked in the middle of the street, with his car facing in the opposite direction. It was not until after he observed signs of intoxication and radioed for backup that he pulled his car in behind defendant's.

the court having considered the evidence and arguments of counsel and having weighed the said evidence; Finds: the officer's testimony regarding burglaries was creditable but not sufficient for the court to conclude that the area of the arrest was a high crime area. The officer essentially saw a young man sitting in a car smoking a cigarette. This conduct is not sufficient to warrant the approach and questioning that took place."

The State filed a certificate of impairment and appealed pursuant to Supreme Court Rule 604(a)(1) (188 Ill. 2d R. 604(a)(1)).

The appellate court affirmed, with one justice dissenting. 357 Ill. App. 3d 411. The appellate court first rejected the State's argument that Officer Pate was acting in a community caretaking or public safety function when he approached defendant's vehicle. 357 Ill. App. 3d at 418-20. Next, the appellate court held that Officer Pate did not have reasonable, articulable suspicion of criminal activity sufficient to justify a *Terry* stop. Central to the appellate court's holding was its belief that defendant was seized before Officer Pate observed an open bottle in defendant's vehicle. 357 Ill. App. 3d at 420. The court acknowledged that none of the factors set forth in the lead opinion in *United States v. Mendenhall*, 446 U.S. 544, 64 L. Ed. 2d 497, 100 S. Ct. 1870 (1980),[2] were present in this case. 357 Ill. App. 3d at 423. However, the court held that the absence of *Mendenhall* factors "says virtually nothing" (357 Ill. App. 3d at 423) and instead found a seizure based upon three other factors. First, Officer Pate stopped his squad car in the middle of the road. The court believed that, by doing so, Officer Pate was demonstrating his authority as a police officer. The court noted that private citizens are not allowed to park in the middle of the street and that Officer Pate communicated a sense of urgency by parking in this manner. 357 Ill. App. 3d at 421. The court believed that Officer Pate should have simply pulled alongside

---

[2]The seizure analysis in Justice Stewart's opinion in *Mendenhall* was joined only by Justice Rehnquist. However, by the time the court decided *Florida v. Royer*, 460 U.S. 491, 75 L. Ed. 2d 229, 103 S. Ct. 1319 (1983), it was apparent that a majority of the court had endorsed the *Mendenhall* test. See 4 W. LaFave, Search & Seizure §9.4(a), at 412 (4th ed. 2004); see also, *e.g.*, *Delgado*, 466 U.S. at 215, 80 L. Ed. 2d at 255, 104 S. Ct. at 1762.

defendant's car and asked him questions because this would have communicated "nothing more than a casual encounter on the street." 357 Ill. App. 3d at 422. Second, Officer Pate was shining a flashlight around and into defendant's car as he approached. 357 Ill. App. 3d at 421. Third, Officer Pate approached from the rear driver's side quarter panel instead of "walking up to the window as an ordinary citizen typically would." 357 Ill. App. 3d at 421. The court concluded that the presence of these three factors meant that a reasonable person would not have felt free to leave. 357 Ill. App. 3d at 421. After concluding that defendant was seized before Officer Pate observed an open bottle in the vehicle, the court considered the propriety of the seizure by addressing whether Officer Pate had a reasonable, articulable suspicion of criminal activity sufficient to justify a *Terry* stop. The court concluded that defendant's actions in slouching down and reaching toward the floorboard of his car at 2:40 in the morning, on a street that had experienced recent burglaries, was insufficient for Officer Pate to have a reasonable, articulable suspicion that defendant was involved in a crime. 357 Ill. App. 3d at 424-25. Accordingly, the court upheld the suppression of evidence in the DUI case. The court also held that the State was not collaterally estopped from contesting the suppression motion in the controlled substances case, because the the DUI suppression order was on appeal and thus not final when the trial court made its collateral estoppel ruling. 357 Ill. App. 3d at 426.

Presiding Justice O'Malley dissented. The dissent agreed with the majority's conclusion that Officer Pate was not acting in a community caretaking or public safety function when he approached defendant's vehicle. The dissent disagreed, however, with the majority's conclusion that defendant was seized as Officer Pate approached defendant's car on foot. The dissent was sharply critical of the majority's approach, which looked to whether Officer Pate was acting like a private citizen or a police officer as he approached defendant's vehicle. The dissent noted that the majority was adopting a rule that "police must act as little like police as possible, lest a seizure occur" (357 Ill. App. 3d at 429 (O'Malley, P.J., dissenting)), and argued that such an approach was incompatible with controlling precedent from the United States Supreme Court and this court. Citing *People v. Gherna*, 203 Ill. 2d 165, 179 (2003), the dissent stated that an individual is not seized for fourth amendment purposes when the police merely ask questions of an individual, so long as the officer

does not convey by words or actions that compliance is required. 357 Ill. App. 3d at 433-34 (O'Malley, P.J., dissenting). More specifically, the dissent noted that " 'the mere approaching and questioning of a person seated in a parked vehicle does not constitute a seizure.' " 357 Ill. App. 3d at 434 (O'Malley, P.J., dissenting), quoting *People v. Murray*, 137 Ill. 2d 382, 391 (1990). The dissent argued that Officer Pate's initial encounter with defendant was no more coercive than the encounter in *Murray*, which this court found not to be a seizure. 357 Ill. App. 3d at 434 (O'Malley, P.J., dissenting). Further, the dissent observed that, in *Murray*, this court relied on the absence of the *Mendenhall* factors in determining that no seizure had occurred. 357 Ill. App. 3d at 434 (O'Malley, P.J., dissenting), citing *Murray*, 137 Ill. 2d at 390-91.

Addressing each of the three factors that the majority found indicative of a seizure, the dissent concluded that none of them were inherently coercive. First, as to the majority's suggestion that Officer Pate should have pulled alongside the defendant's vehicle instead of driving past it and parking in the center of the street, the dissent argued that this would have been *more* coercive because Officer Pate would have been blocking defendant's car in its space. As to the majority's concern that the law does not allow private citizens to park in the middle of the street, the dissent argued that the law also does not allow private citizens to double park cars in order to carry on conversations with occupants of other vehicles. 357 Ill. App. 3d at 431 (O'Malley, P.J., dissenting). Second, the dissent addressed the majority's concern about Officer Pate's use of a flashlight by citing cases holding that the shining of a flashlight into a car is not inherently coercive (see *People v. Holdman*, 73 Ill. 2d 213, 220 (1978); *People v. Erby*, 213 Ill. App. 3d 657, 662 (1991)). 357 Ill. App. 3d at 432 (O'Malley, P.J., dissenting). Third, as to the angle of Officer Pate's approach to the vehicle, the dissenting justice stated that he did not understand the majority's "geometrical analysis." 357 Ill. App. 3d at 432 (O'Malley, P.J., dissenting). The dissent disputed the majority's assertion that a private citizen would walk right up to the window rather than approaching from the rear. The dissent contended that the trajectory of a private citizen's approach to the car would be determined from where he began his approach. 357 Ill. App. 3d at 432 (O'Malley, P.J., dissenting). The dissent argued that officers approach from the rear out of concern for their safety, and

that the majority's requirement that the police do not use such tactics could have "truly lethal effects." 357 Ill. App. 3d at 432 (O'Malley, P.J., dissenting). For all of these reasons, the dissent predicted that reversal by this court was inevitable. 357 Ill. App. 3d at 435 (O'Malley, P.J., dissenting). We allowed the State's petition for leave to appeal. 177 Ill. 2d R. 315. Additionally, we granted the Fraternal Order of Police of Illinois leave to submit an *amicus curiae* brief in support of the State.

ANALYSIS

The State raises two issues. First, the State argues that the appellate court erred in determining that defendant was seized before Officer Pate observed an open bottle in his vehicle. The State contends that the seizure did not occur until after Officer Pate observed an open bottle and signs of intoxication. Alternatively, the State contends that, even if Officer Pate effectuated a *Terry* stop prior to observing the open bottle, the stop was supported by a reasonable suspicion that defendant was engaged in criminal activity. The State has abandoned its argument that Officer Pate was acting in a community caretaking or public safety capacity when he approached defendant's vehicle.

Standard of Review

In reviewing a trial court's ruling on a motion to suppress evidence, we apply the two-part standard of review adopted by the Supreme Court in *Ornelas v. United States*, 517 U.S. 690, 699, 134 L. Ed. 2d 911, 920, 116 S. Ct. 1657, 1663 (1996). Under this standard, a trial court's findings of historical fact should be reviewed only for clear error, and a reviewing court must give due weight to any inferences drawn from those facts by the fact finder. *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663. In other words, we give great deference to the trial court's factual findings, and we will reverse those findings only if they are against the manifest weight of the evidence. *People v. Sorenson*, 196 Ill. 2d 425, 431 (2001). A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted. *People v. Pitman*, 211 Ill. 2d 502, 512 (2004). Accordingly, we review *de*

*novo* the trial court's ultimate legal ruling as to whether suppression is warranted.[3] *Ornelas*, 517 U.S. at 699, 134 L. Ed. 2d at 920, 116 S. Ct. at 1663; *Pitman*, 211 Ill. 2d at 512; *Sorenson*, 196 Ill. 2d at 431.

### Timing of the Seizure

The critical issue in this case is the timing of the seizure. The State argues that the seizure did not occur until after Officer Pate

---

[3]We briefly note that in *People v. Caballes*, 221 Ill. 2d 282, 289 (2006), we stated, " '[W]hen a trial court's ruling on a motion to suppress evidence involves factual determinations and credibility assessments,' the ruling will not be disturbed on appeal unless it is manifestly erroneous." This sentence quoted *Sorenson*'s description of the pre-*Sorenson* standard of review, but only for purposes of describing why we were reviewing the trial court's finding that "the police dog *** was well trained and sufficiently reliable" under the manifest weight of the evidence standard–*i.e.*, because that finding was a factual determination to which deference was owed. See *Caballes*, 221 Ill. 2d at 289. To avoid any future confusion, we clarify that, in *Caballes*, we did not intend to revert to the pre-*Sorenson* standard of review. Indeed, in *Caballes*, we went on to conclude that "[o]n the record before us, we find no basis for concluding that the trial court's *finding of reliability* was manifestly erroneous" (emphasis added) (*Caballes*, 221 Ill. 2d at 335), by which we meant that the factual determination subject to our review was not against the manifest weight of the evidence.

observed an open bottle in the vehicle and noticed that defendant was exhibiting signs of intoxication. These observations obviously gave Officer Pate the reasonable suspicion necessary to detain defendant and to investigate further. Defendant contends, however, that the appellate court correctly determined that the seizure occurred prior to Officer Pate's observation of the open bottle. Defendant argues that he was seized for fourth amendment purposes when Officer Pate parked his vehicle in the middle of the street and approached defendant's car from the rear, while illuminating the car with a flashlight. Thus, according to defendant, we must determine whether Officer Pate had a reasonable suspicion of criminal activity sufficient to effectuate a seizure before he observed the open bottle. Defendant contends that the lower courts correctly concluded that such reasonable suspicion was lacking. We agree with the State that no seizure occurred until after Officer Pate had a reasonable suspicion that defendant was intoxicated while in control of a motor vehicle and thus do not address whether Officer Pate had a reasonable suspicion of criminal activity when he first approached defendant's vehicle.

*The Three Tiers of Police-Citizen Encounters*

It is well settled that not every encounter between the police and a private citizen results in a seizure. *Delgado*, 466 U.S. at 215, 80 L. Ed. 2d at 254, 104 S. Ct. at 1762; *People v. White*, 221 Ill. 2d 1, 21 (2006). Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or "*Terry* stops," which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests. *United States v. Black*, 675 F.2d 129, 133 (7th Cir. 1982); *United States v. Berry*, 670 F.2d 583, 591 (5th Cir. 1982). Third-tier encounters are also known as consensual encounters. *Gherna*, 203 Ill. 2d at 177. Previously, when listing the three tiers of police-citizen encounters, this court has often used imprecise language. This court has frequently referred to the third tier as the "community caretaking function." See, *e.g.*, *White*, 221 Ill. 2d at 21; *People v. Smith*, 214 Ill. 2d 338, 351-52 (2005); *People v. Murray*, 137 Ill. 2d 382, 387 (1990). The appellate court, both in this case and other cases, has been critical of this court's use

of the label "community caretaking" to describe third-tier consensual encounters. See 357 Ill. App. 3d at 418-20; *People v. James*, 365 Ill. App. 3d 847, 851 (2006); *People v. Mitchell*, 355 Ill. App. 3d 1030, 1033-34 (2005). The use of this label is traceable to *Murray*, in which this court cited *Berry* for the three tiers, but then added an incorrect explanatory sentence. Initially, *Murray* properly stated that the third tier "involves no coercion or detention and therefore does not involve a seizure." *Murray*, 137 Ill. 2d at 387. *Murray* then incorrectly stated that "[t]his tier is commonly known as the community caretaking function or public safety function." *Murray*, 137 Ill. 2d at 387. No citation to authority was provided for this assertion.

In *Collins v. State*, 1993 WY 83, 854 P.2d 688, the Supreme Court of Wyoming collected the state and federal cases that have recognized, either explicitly or implicitly, the three tiers, and this court's decision in *Murray* was the only one to refer to the third tier as "community caretaking." See *Collins*, 1993 WY 83, ¶10 nn.3, 4, 854 P.2d at 692 nn.3, 4 (collecting cases).[4] That courts do not generally refer to the third tier as community caretaking makes sense. Third-tier encounters are consensual encounters involving no coercion or detention. "Community caretaking," rather than describing a tier of police-citizen encounter, refers to a capacity in which the police act when they are performing some task unrelated to

---

[4]Since *Collins* was decided, courts in three other states–New Mexico, North Dakota, and Tennessee–have referred to the third tier as "community caretaking." In *State v. Ryon*, 137 N.M. 174, 183, 108 P.3d 1032, 1041 (2005), the Supreme Court of New Mexico acknowledged its mistake and overruled those cases that had used community caretaking as a label to describe voluntary or consensual encounters. North Dakota began using the label in *State v. Halfman*, 518 N.W.2d 729, 730 (N.D. 1994). The three cases it cited for this proposition were *Murray*, *United States v. Hernandez*, 854 F.2d 295 (8th Cir. 1988), and *Thompson v. State*, 303 Ark. 407, 797 S.W.2d 450 (1990). Neither *Hernandez* nor *Thompson* refer to the third tier as community caretaking, so it appears that North Dakota's use of the label has its origins in this court's decision in *Murray*. Tennessee began using the label in *State v. Hawkins*, 969 S.W.2d 936, 939 (Tenn. Crim. App. 1997). Like this court in *Murray*, the Tennessee court cited the Fifth Circuit's decision in *Berry* for this proposition, and *Berry* contains no such statement.

the investigation of crime. See D. Livingston, *Police, Community Caretaking, and the Fourth Amendment*, 1998 U. Chi. Legal F. 261, 261-63, 272 (1998) (noting that "[p]olice spend relatively less time than is commonly thought investigating violations of the criminal law" and spend a good deal of time performing such functions as responding to heart attack victims, helping children find their parents, helping inebriates find their way home, responding to calls about missing person or sick neighbors, mediating noise disputes, responding to calls about stray or injured animals, investigating premises left open at night, taking lost property into their possession, and removing abandoned property). Courts use the term "community caretaking" to uphold searches or seizures as reasonable under the fourth amendment when police are performing some function other than investigating the violation of a criminal statute. When a search is involved, courts use the term "community caretaking" to describe an exception to the warrant requirement. See, *e.g.*, *United States v. Coccia*, 446 F.3d 233, 238 (1st Cir. 2006); *United States v. Johnson*, 410 F.3d 137, 143-44 (4th Cir. 2005).

The community caretaking exception was first set forth by the Supreme Court in *Cady v. Dombrowski*, 413 U.S. 433, 37 L. Ed. 2d 706, 93 S. Ct. 2523 (1973). In that case, a Chicago police officer who had been drinking was involved in an automobile accident in Wisconsin. The Wisconsin officers who responded to the scene were under the impression that Chicago police officers were required to carry their service revolvers with them at all times. Before the car was towed from the scene, the Wisconsin officers looked in the glove box and the front-seat area to see if they could locate the revolver. No revolver was found in those areas, and the automobile was towed to a garage. One of the officers later went to the garage and searched the passenger compartment and trunk. The officer testified that attempting to retrieve a weapon in these situations was standard police procedure. The purpose of this procedure was to prevent the public from "the possibility that a revolver would fall into untrained or perhaps malicious hands." *Cady*, 413 U.S. at 443, 37 L. Ed. 2d at 716, 93 S. Ct. at 2529. The officer did not find the revolver, but he did find various bloody items, and the question was whether they could later be used in a murder prosecution against the Chicago officer. The Supreme Court upheld the search as reasonable under the fourth amendment. The Court explained that "[l]ocal police officers,

unlike federal officers, frequently investigate vehicle accidents in which there is no claim of criminal liability and engage in what, for want of a better term, may be described as community caretaking functions, totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute." *Cady*, 413 U.S. at 441, 37 L. Ed. 2d at 714-15, 93 S. Ct. at 2528. The search was reasonable because it was undertaken to protect the safety of the general public. *Cady*, 413 U.S. at 447, 37 L. Ed. 2d at 718, 93 S. Ct. at 2531. The Court also noted that at the time the Wisconsin officer searched the car, he was unaware that a murder had been committed. *Cady*, 413 U.S. at 447, 37 L. Ed. 2d at 718, 93 S. Ct. at 2531.

An example of a seizure upheld under the community caretaking exception is found in *State v. Chisholm*, 39 Wash. App. 864, 696 P.2d 41 (1985). In that case, a police officer in an unmarked car noticed a pickup truck that had a hat on top of it. He tried unsuccessfully to get the driver's attention, and then radioed ahead to an officer in a marked vehicle. The second officer stopped the defendant's vehicle to tell him about the hat, and, upon approaching, noticed an open can of beer in plain view. The court upheld the stop under the community caretaking exception, noting that "an individual's interest in proceeding about his business unfettered by police interference must be balanced against the public's interest in having police officers perform services in addition to the traditional enforcement of penal and regulatory laws." *Chisholm*, 39 Wash. App. at 867, 696 P.2d at 43.

The courts in these cases upheld the searches or seizures as reasonable because the police were acting in a community caretaking or public safety function. The analysis had nothing to do with the encounters being consensual. Because the officer in *Chisholm* stopped the defendant's vehicle, the encounter could not be said to have involved no detention. The defendant in *Cady* did not consent to the search of his vehicle. Indeed, if "community caretaking" was just another name for consensual encounters, there would have been no need for the Supreme Court to formulate the exception in the first place. To be sure, a police officer acting in a community caretaking function can engage in a consensual encounter. For instance, if a police officer stops to aid a person whose vehicle has broken down on the side of the highway and then notices an open bottle of alcohol

in the car, the officer would be both acting in his community caretaking function and engaging in a consensual encounter. However, because the act of stopping to assist a stranded motorist would not have been a seizure in the first place, a court would have no need to invoke the community caretaking exception.

It is clear, then, that the "community caretaking" doctrine is analytically distinct from consensual encounters and is invoked to validate a search or seizure as reasonable under the fourth amendment. It is not relevant to determining whether police conduct amounted to a seizure in the first place. Those cases such as *White*, *Smith*, and *Murray*, that refer to the third tier of police-citizen encounters as "community caretaking," should no longer be followed for that point. Similarly, cases such as *People v. Gonzalez*, 204 Ill. 2d 220, 224 (2003), that state that "community caretaking" is a label to describe consensual encounters should no longer be followed on that specific point.

This court's error in describing the third tier is not without consequence. If the third tier of police-citizen encounters is referred to as "community caretaking," that would suggest that if the police lack a reasonable, articulable suspicion of criminal activity, they may not approach a citizen unless they are acting in a community caretaking function. This is obviously not the case, as the law clearly provides that a police officer does not violate the fourth amendment merely by approaching a person in public to ask questions if the person is willing to listen. *United States v. Drayton*, 536 U.S. 194, 200, 153 L. Ed. 2d 242, 251, 122 S. Ct. 2105, 2110 (2002); *People v. Love*, 199 Ill. 2d 269, 278 (2002). There has never been a requirement that the police must be acting in a community caretaking function to prevent the encounter from turning into a seizure. Indeed, the Supreme Court has stated expressly that the police have the right to approach citizens and ask potentially incriminating questions. See *Florida v. Bostick*, 501 U.S. 429, 439, 115 L. Ed. 2d 389, 401, 111 S. Ct. 2382, 2388 (1991) ("The dissent reserves its strongest criticism for the proposition that police officers can approach individuals as to whom they have no reasonable suspicion and ask them potentially incriminating questions. But this proposition is by no means novel; it has been endorsed by the Court any number of times. *Terry*, *Royer*, *Rodriguez*, and *Delgado* are just a few examples"); see also, *e.g.*, *United States v. Winston*, 892 F.2d 112, 117 (D.C. Cir. 1989) (lawful

for police officer to approach the defendant and ask questions regardless of whether the officer had a reasonable suspicion that the defendant was involved in a crime); *People v. Melton*, 910 P.2d 672, 677 (Colo. 1996) ("[t]he subjective suspicions of the police do not distinguish a consensual encounter from an investigatory stop. In fact, in most cases regarding consensual encounters the police approach individuals because they have suspicions about them").

### *The Encounter Between Officer Pate and Defendant*

Having properly set forth the three tiers of police-citizen encounters, we next consider the nature of the encounter when Officer Pate approached defendant's vehicle. Defendant contends that Officer Pate seized him for fourth amendment purposes before observing the open bottle and signs of intoxication, while the State maintains that the encounter remained a third-tier consensual encounter prior to Officer Pate's observations.

For purposes of the fourth amendment, an individual is "seized" when an officer " 'by means of physical force or show of authority, has in some way restrained the liberty of a citizen.' " *Bostick*, 501 U.S. at 434, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386, quoting *Terry v. Ohio*, 392 U.S. 1, 19 n.16, 20 L. Ed. 2d 889, 905 n.16, 88 S. Ct. 1868, 1879 n.16 (1968). Initially, we note that the appellate court framed the seizure standard incorrectly. Citing *Mendenhall*, the appellate court stated that a "seizure occurs when a reasonable person would not feel free to leave under the circumstances." 357 Ill. App. 3d at 421. Although "free to leave" is the correct test for certain situations, it was not applicable here. In *Bostick*, 501 U.S. at 435, 115 L. Ed. 2d at 399, 111 S. Ct. at 2386, the Supreme Court explained that the "free to leave" language makes sense when the person is walking down a street or through an airport lobby. However, in situations in which the person's freedom of movement is restrained by some factor independent of police conduct the "free to leave" test is inapplicable and "the appropriate inquiry is whether a reasonable person would feel free to decline the officers' requests or otherwise terminate the encounter." *Bostick*, 501 U.S. at 436, 115 L. Ed. 2d at 400, 111 S. Ct. at 2387. In *Bostick*, the Supreme Court applied this test to persons seated on a bus.

The question of which test applies to a person seated in a parked vehicle was settled by this court in *Gherna*. In that case, this court applied *Bostick* rather than *Mendenhall*. See *Gherna*, 203 Ill. 2d at 178. Thus, the appropriate test is whether a reasonable person in defendant's position would have believed he was free to decline Officer Pate's requests or otherwise terminate the encounter. Moreover, the test presupposes a reasonable *innocent* person. *Bostick*, 501 U.S. at 438, 115 L. Ed. 2d at 400, 111 S. Ct. at 2388. The analysis requires an objective evaluation of the police conduct in question and does not hinge upon the subjective perception of the person involved. *White*, 221 Ill. 2d at 21-22. It is well settled that a seizure does not occur simply because a law enforcement officer approaches an individual and puts questions to that person if he or she is willing to listen. *Gherna*, 203 Ill. 2d at 178; *Drayton*, 536 U.S. at 200, 153 L. Ed. 2d at 251, 122 S. Ct. at 2110. In *Bostick*, the Supreme Court explained that the police may do more than merely ask questions without turning the encounter into a seizure:

> "We have stated that even when officers have no basis for suspecting a particular individual, they may generally ask questions of that individual [citations] ; ask to examine the individual's identification [citations]; and request consent to search his or her luggage [citations]–as long as the police do not convey a message that compliance with their requests is required." *Bostick*, 501 U.S. at 434-35, 115 L. Ed. 2d at 398-99, 111 S. Ct. at 2386.

The central flaw in the appellate court's opinion was its failure to consider and discuss the large body of case law addressing whether police approaches to parked vehicles amounted to seizures. The appellate court freed itself from the moorings of precedent by asserting that each of these cases is "*sui generis* in that no two factual situations are identical" and that, while precedent may provide some insight, "common sense" must be a court's main guide. 357 Ill. App. 3d at 421. The court's failure to consider the applicable case law resulted in the court's finding a seizure based on factors that courts had not previously found to be coercive, and the necessary consequence of the appellate court's opinion would be to make a seizure of every approach of a police officer to a parked vehicle at night.

Although it is true that the facts of no two cases are ever *exactly* the same, that does not mean that a court is free simply to ignore an entire body of relevant case law and the principles and guidelines articulated therein. Nowhere in the appellate court majority opinion is there even an acknowledgment of the general rule that the police may approach and question a person seated in a parked vehicle without that encounter being labeled a seizure. As Professor LaFave has noted, "if an officer merely walks up to a person standing or sitting in a public place (or, indeed, who is seated in a vehicle located in a public place) and puts a question to him, this alone does not constitute a seizure." 4 W. LaFave, Search & Seizure §9.4(a), at 419-21 (4th ed. 2004). The "seated in a vehicle" clause of the above passage is supported by a lengthy list of citations to the many state and federal decisions that have recognized this rule. See 4 W. LaFave, Search & Seizure §9.4(a), at 419-20, 420 n.49 (collecting cases). In *Murray*, this court held that the mere approaching and questioning of a person seated in a parked vehicle does not constitute a seizure and listed many decisions from other jurisdictions that had reached the same conclusion. *Murray*, 137 Ill. 2d at 391-93. Thus, any analysis of such a situation must begin with the recognition that the police may approach a person seated in a parked vehicle and ask questions of that person without that encounter being labeled a seizure.[5] The encounter becomes a seizure only if the officer, through

---

[5]This rule in and of itself defeats the trial court's rationale for granting the motion to suppress. In the trial court, defendant argued that Officer Pate "had no right at that time to approach [defendant] and engage him in conversation under the circumstances." The trial court adopted this position in its written order, stating that Officer Pate had not observed conduct sufficient to warrant the approach and questioning that took place. In later explaining its ruling from the bench, the trial court stated, "[t]here was no basis to approach."

physical force or a show of authority, restrains the liberty of the vehicle's occupant. See *Bostick*, 501 U.S. at 434, 115 L. Ed. 2d at 398, 111 S. Ct. at 2386

In *Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877, the lead opinion listed four factors that may be indicative of a seizure: (1) the threatening presence of several officers; (2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled. This court adopted these factors in *Murray*. See *Murray*, 137 Ill. 2d at 390. The record clearly shows that none of these factors were present here. The appellate court did not consider this relevant because it concluded that "[w]hile the presence of such factors may be highly indicative of the occurrence of a seizure, *their absence says virtually nothing*." (Emphasis added.) 357 Ill. App. 3d at 423. Immediately preceding this passage, however, the appellate court cited those pages in *Murray* (137 Ill. 2d at 390-91) in which we find the exact opposite rule. In *Murray*, this court listed the four *Mendenhall* factors and then quoted *Mendenhall* for the proposition that " '*[i]n the absence of some such evidence*, otherwise inoffensive contact between a member of the public and the police cannot, as a matter of law, amount to a seizure of that person.' " (Emphasis added.) *Murray*, 137 Ill. 2d at 390-91, quoting *Mendenhall*, 446 U.S. at 555, 64 L. Ed. 2d at 509-10, 100 S. Ct. at 1877. After stating this rule, this court reviewed each of the *Mendenhall* factors, found that they were absent, and thus concluded that no seizure had occurred. *Murray*, 137 Ill. 2d at 390-91; see also *Smith*, 214 Ill. 2d at 353-54 (relying on absence of *Mendenhall* factors to conclude that no seizure had occurred). Indeed, *Mendenhall itself* used an analysis based on the absence of *Mendenhall* factors. The lead opinion listed the four factors, noted their absence, and then concluded that no seizure had occurred. *Mendenhall*, 446 U.S. at 554-55, 64 L. Ed. 2d at 509-10, 100 S. Ct. at 1877. From the very minute the *Mendenhall* factors were created, courts have used their absence to determine that seizures had not occurred.

Even in the absence of cases such as *Mendenhall*, *Murray*, and *Smith*, it would seem self-evident that the absence of *Mendenhall* factors, while not necessarily conclusive, is highly instructive. If those factors are absent, that means that only one or two officers

approached the defendant, they displayed no weapons, they did not touch the defendant, and they did not use any language or tone of voice indicating that compliance with their requests was compelled. Obviously, a seizure is much less likely to be found when officers approach a person in such an inoffensive manner.

The appellate court believed that, because *Mendenhall* stated that courts should look to the totality of the circumstances in determining whether a seizure had occurred, the court must conduct a "practical, realistic" inquiry to determine if a reasonable person would have felt free to leave and that the court should not focus on rigid, technical rules such as the *Mendenhall* factors.[6] 357 Ill. App. 3d at 421-24. The problem with this view is that, immediately after *Mendenhall* said that a person is seized if "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave" (*Mendenhall*, 446 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877), it elaborated on how courts are to make that determination. The lead opinion listed several factors that are generally indicative of a seizure, said that in the absence of some such evidence otherwise inoffensive contact between a member of the public and the police is not a seizure, and then concluded that no seizure had occurred because those factors were not present. *Mendenhall*, 446 U.S. at 554-55, 64 L. Ed. 2d at 509-10, 100 S. Ct. at 1877. This court expressly adopted those factors in *Murray*. The "in view of all the circumstances" language must be read in concert with, not in opposition to, the factors. See, *e.g.*, *Smith*, 214 Ill. 2d at 352-53. The factors illustrate what type of police conduct would give a reasonable person an objective reason to believe that he or she was not free to leave or was not free to decline an officer's requests.

Moreover, we disagree with the appellate court's characterization of *Mendenhall* as requiring a "practical, realistic inquiry" of whether a reasonable person in the defendant's situation would feel free to

---

[6]It is not entirely clear how the appellate court determined that "in view of all the circumstances" is synonymous with "practical, realistic inquiry." The Supreme Court's requirement that courts consider all the circumstances means simply that courts must assess the coercive effect of police conduct taken as a whole. See *Michigan v. Chesternut*, 486 U.S. 567, 573, 100 L. Ed. 2d 565, 572, 108 S. Ct. 1975, 1979 (1988).

leave. This is not a description that one often sees applied to the *Mendenhall* standard. Indeed, the first person identified under the *Mendenhall* standard as someone who would feel free to walk away was a woman approached in an airport by federal agents who identified themselves as such and asked to see her ticket and identification. Justice Stewart's opinion did not consider *practically and realistically* whether people in airports feel free to walk away from federal agents who ask to see their tickets and identification, but rather looked *objectively* at the police conduct under recognized factors to determine if they had curtailed the defendant's liberty through physical force or a show of authority. Moreover, the Court focused on what, objectively, the police conduct would cause a reasonable person to believe: "[N]othing in the record suggests that the respondent had any objective reason to believe that she was not free to end the conversation in the concourse and proceed on her way ***." *Mendenhall*, 446 U.S. at 555, 64 L. Ed. 2d at 510, 100 S. Ct. at 1878. Professor LaFave has explained that the *Mendenhall* test is not to be given a literal reading:

> "[I]f [the free to walk away language] is taken to mean that a pedestrian whose movements have been interrupted and who is questioned is likely to feel free to depart without responding, it is a highly questionable conclusion. As noted in *Illinois Migrant Council v. Pilliod*: 'Implicit in the introduction of the [officer] and the initial questioning is a show of authority to which the average person encountered will feel obliged to stop and respond. Few will feel that they can walk away or refuse to answer.' This, it is submitted, is an accurate characterization of the great majority of situations in which an officer approaches a pedestrian and seeks an explanation for his activities or even identification. Thus, if the ultimate issue is perceived as being whether the suspect 'would feel free to walk away,' then virtually all police-citizen encounters must in fact be deemed to involve a Fourth Amendment seizure. The *Mendenhall-Royer* standard should not be given such a literal reading as to produce such a result." 4 W. LaFave, Search & Seizure §9.4(a), at 423-24 (4th ed. 2004).

We thus do not agree with the appellate court's conclusion that the absence of *Mendenhall* factors "says virtually nothing" and that a

seizure is determined solely by a "practical, realistic" inquiry into whether a reasonable person in defendant's position would have felt free to leave (or, as is appropriate here, whether a reasonable person would have felt free to decline the officer's requests or otherwise terminate the encounter). Rather, the Supreme Court requires an *objective* evaluation of police conduct, based upon recognized standards, and an *objective* evaluation of what that conduct would cause a reasonable person to believe. This makes perfect sense because "any test intended to determine what street encounters are not seizures must be expressed in terms that can be understood and applied by the officer." See 4 W. LaFave, Search & Seizure §9.4(a), at 414 (4th ed. 2004).

Although it is not true that the absence of *Mendenhall* factors "says virtually nothing," it is true that those factors are not exhaustive and that a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors. Courts have developed additional rules applicable to police approaches of occupants of parked vehicles. Professor LaFave has summarized these cases as follows:

> "As noted earlier, the mere approach and questioning of [persons seated within parked vehicles] does not constitute a seizure. The result is not otherwise when the officer utilizes some generally accepted means of gaining the attention of the vehicle occupant or encouraging him to eliminate any barrier to conversation. The officer may tap on the window and perhaps even open the door if the occupant is asleep. A request that the suspect open the door or roll down the window would seem equally permissible, but the same would not be true of an order that he do so. Likewise, the encounter becomes a seizure if the officer orders the suspect to 'freeze' or to get out of the car." 4 W. LaFave, Search & Seizure §9.4(a), at 433 (4th ed. 2004).

By contrast, factors that courts have found indicative of a seizure of a parked vehicle are "boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority." 4 W. LaFave, Search & Seizure §9.4(a), at 434-35 (4th ed. 2004). Because the appellate court failed to discuss these factors, it is

unclear whether they were aware of them. We find it relevant that Officer Pate's encounter with defendant involved none of this conduct.

The appellate court did identify three new factors that it believed were indicative of a seizure, but we disagree with the court's conclusion that these factors are coercive. The first factor cited by the appellate court was Officer Pate's stopping of his vehicle in the middle of the roadway. The appellate court concluded that, by doing so, Officer Pate was demonstrating his authority as a police officer because private citizens may not stop their cars in the middle of the street and "block traffic."[7] 357 Ill. App. 3d at 421. The court cited section 11−1304 of the Illinois Vehicle Code (625 ILCS 5/11−1304 (West 2002)). The court further concluded that Officer Pate's stopping of his vehicle in this manner demonstrated a sense of urgency. According to the appellate court, what Officer Pate should have done instead would have been to pull up alongside defendant's vehicle and talk to him because that would have communicated "nothing more than a casual encounter on the street." 357 Ill. App. 3d at 422.

There are several problems with the appellate court's analysis. First, the court cited no authority for the proposition that a police officer's parking of his vehicle in a manner not allowed for private citizens is inherently coercive. We find it more relevant that Officer Pate did nothing to signal that compliance was expected, such as turning on his overhead flashing lights as a show of authority. He did not even pull his car in behind defendant's vehicle until after he had noticed signs of intoxication. Although the appellate court believed that Officer Pate was demonstrating a sense of urgency and displaying his authority as a police officer, another equally likely explanation for Officer Pate's behavior was that he did not expect to be at the scene very long. This inference is supported by the fact that

---

[7]Because Officer Pate was parked on a residential street, in a small town, at 2:40 a.m., the appellate court's concern that he was "blocking traffic" was overstated.

Officer Pate pulled his vehicle in behind defendant's vehicle *after* he noticed signs of intoxication and radioed for assistance. Once it was apparent that he would be at the scene for a while, he moved his car out of the middle of the street. Second, even if the appellate court was correct that a police officer commits a show of authority by parking in a manner not allowed for private citizens, its proposed cure would not have fixed the problem. If Officer Pate would have pulled up alongside the defendant's vehicle as the appellate court wanted him to do, that also would have been an action that the law does not allow private citizens to engage in. See 625 ILCS 5/11–1303(a)(1) (West 2004) ("[e]xcept when necessary to avoid conflict with other traffic, or in compliance with law or the directions of a police officer or official traffic-control device, no person shall: 1. Stop, stand or park a vehicle: a. On the roadway side of any vehicle stopped or parked at the edge or curb of a street"). Third, if Officer Pate would have pulled alongside defendant's vehicle, he would have been blocking defendant in his parking space, and this is a factor often used by courts to determine that a seizure of a person in a parked vehicle has occurred. In *Gherna*, one of the factors that this court relied on in determining that the defendant was seized was that two officers on bicycles positioned themselves alongside the driver's door and the passenger's door: "the positioning of the officers and their bicycles prevented defendant from either exiting the vehicle or driving the vehicle away from the scene." *Gherna*, 203 Ill. 2d at 180; see also *United States v. Kerr*, 817 F.2d 1384 (9th Cir. 1987) (finding seizure where police blocked car in a one-lane driveway); *People v. Beverly*, 364 Ill. App. 3d 361, 370 (2006) (finding seizure where police officer parked perpendicularly behind defendant's vehicle, blocking it in its parking spot); *Commonwealth v. King*, 389 Mass. 233, 241, 449 N.E.2d 1217, 1223 (1983) (officer committed seizure when he positioned his cruiser in such a way as to block defendant's vehicle in its parking space); *State v. Roberts*, 293 Mont. 476, 483, 977 P.2d 974, 979 (1999) (seizure where officer parked his car in such a way as to block defendant in his driveway); *Commonwealth v. Greber*, 478 Pa. 63, 67, 385 A.2d 1313, 1316 (1978) (seizure where officer parked his squad car in front of a parked car in such a way as to block it in a parking lot); *cf. United States v. Encarnacion-Galvez*, 964 F.2d 402, 410 (5th Cir. 1992) (border patrol agents approached two persons in a parked vehicle and asked for identification; court found

˘24˘

no seizure, in part because the "agents did not park their vehicle in such a way that would block Encarnacion-Galvez's path if he chose to drive or walk away"). We noted earlier the importance in seizure analysis of setting forth guidelines that can be understood and applied by the officer. It is surely not reasonable, after the courts have for years found that blocking cars in their parking spots is coercive, to hold that Officer Pate seized defendant because he *failed* to block defendant in his parking space. See *Chesternut*, 486 U.S. at 574, 100 L. Ed. 2d at 572, 108 S. Ct. at 1979-80 (noting that seizure standard "calls for consistent application from one police encounter to the next" so that the police may "determine in advance whether the conduct contemplated will implicate the Fourth Amendment"). In sum, we find nothing inherently coercive in the way Officer Pate parked his vehicle.

The second factor relied upon by the appellate court was that Officer Pate shined a flashlight on defendant's car as he approached. According to the appellate court, shining a flashlight is intrusive and is analogous to the *Mendenhall* factor of using language or tone of voice indicating that compliance is compelled.[8] 357 Ill. App. 3d at 422. Once again, precedent leads to the opposite result. It is well settled that the use of a flashlight to illuminate a vehicle located on a public way is not a fourth amendment search. *Texas v. Brown*, 460 U.S. 730, 739-40, 75 L. Ed. 2d 502, 512, 103 S. Ct. 1535, 1542 (1983) ("It is likewise beyond dispute that Maples' action in shining his flashlight to illuminate the interior of Brown's car trenched upon no right secured to the latter by the Fourth Amendment"); see also 1 W. LaFave, Search & Seizure §2.2(b), at 461-62 (4th ed. 2004) (explaining rule and stating that "the reason typically given is that the owner or operator of an automobile parked or being operated on a public thoroughfare does not have a justified expectation that such a common device as a flashlight would not be used during the nighttime to see what would be visible without such illumination during daylight hours"). Whether the use of a flashlight constitutes a fourth amendment seizure depends on whether the officer engaged in

[8]This is the only one of the three factors that the appellate court analogized to one of the *Mendenhall* factors.

other coercive behavior. In *People v. Holdman*, 73 Ill. 2d 213, 220 (1978), this court held that shining a light on a vehicle was not a "stop" when there was no coercion or threat of coercion. See also *People v. Erby*, 213 Ill. App. 3d 657, 662 (1991) (shining a light on a parked vehicle not a stop absent coercion or threat of coercion). By contrast, in *People v. Bunch*, 207 Ill. 2d 7, 19 (2003), this court found that the defendant was seized when, after a police officer ordered him to exit a vehicle in which he had been a passenger, the officer had him stand next to the handcuffed and arrested driver, stood one foot away from him, shined a flashlight in his face, and said, "What's your name? Where you coming from?" Courts in other jurisdictions have also generally found that the use of a flashlight or a spotlight, without other coercive behavior, is insufficient to transform a consensual encounter into a seizure. See, *e.g.*, *State v. Stuart*, 168 Ariz. 83, 86, 811 P.2d 335, 338 (App. 1990) (shining spotlight on vehicle not a seizure); *People v. Perez*, 211 Cal. App. 3d 1492, 1496, 260 Cal. Rptr. 172, 174 (1989) (shining high beams and spotlights on vehicle not a detention; "[w]hile the use of high beams and spotlights might cause a reasonable person to feel himself the object of official scrutiny, such directed scrutiny does not amount to a detention"); *People v. Cascio*, 932 P.2d 1381, 1388 (Colo. 1997) (officers' use of flashlights and a spotlight was a practical necessity because it was getting dark; no seizure because lights were not used in an intimidating manner); *State v. Baker*, 141 Idaho 163, 167, 107 P.3d 1214, 1218 (2004) (using spotlight to illuminate the defendant's car was not a seizure); *Campbell v. State*, 841 N.E.2d 624, 630 (Ind. App. 2006) (shining of spotlight on defendant, who was standing next to a parked car, not a seizure); *Commonwealth v. Eckert*, 431 Mass. 591, 595, 728 N.E.2d 312, 316 (2000) ("by walking up to the defendant's parked vehicle at the rest area, shining his flashlight inside and asking whether the defendant was 'all set,' Trooper Shugrue did not engage in any conduct that requires constitutional justification"); *State v. Clayton*, 309 Mont. 215, 221, 45 P.3d 30, 35 (2002) (shining of spotlight on defendant's vehicle not a seizure); *State v. Justesen*, 2002 UT App 165, ¶15, 47 P.3d 936, 939 (officer's use of take-down lights served to illuminate the area and was not a show of authority); *State v. Young*, 135 Wash. 2d 498, 513-14, 957 P.2d 681, 688-89 (1998) (use of spotlight not a seizure). When the use of a light is accompanied by coercive behavior, such as blocking a car in its

parking space, the courts will be more likely to find a seizure. See, *e.g.*, *United States v. Packer*, 15 F.3d 654, 657 (7th Cir. 1994) (seizure found when officers' vehicles were in front of and behind defendant's vehicle and had their take-down lights shining, and one officer approached with a flashlight shining and asked the vehicle's occupants to put their hands in the air); *Commonwealth v. Mulholland*, 2002 PA Super. 59, ¶11, 794 A.2d 398, 401-02 (seizure found when police officer shined a spotlight on the defendant's vehicle and parked his cruiser in such a way that the defendant could not exit the parking lot).

Here, Officer Pate's use of the flashlight was not accompanied by other coercive behavior. As we noted above, he parked his car past defendant's vehicle so as not to block it in its space and did not activate his overhead flashing lights. He merely shined his flashlight on the car as he walked toward it. We view this behavior not as coercive, but as merely incident to a police officer's performance of his job after dark. In *Baker*, the Idaho Supreme Court noted that a police officer's use of a light at night allows him to gain more information about the situation he is confronting, which can significantly enhance officer safety. *Baker*, 141 Idaho at 167, 107 P.3d at 1218. If we adopted the appellate court's view that the use of a flashlight is inherently coercive and analogous to a tone of voice indicating that compliance is compelled, that would make a seizure of any nighttime encounter in which an officer uses a flashlight or spotlight. This would leave the officer with a dilemma that we are not prepared to require: " 'an officer is not constitutionally required to choose between a consensual encounter in the dark or turning on a spotlight and thereby effectuating a detention that may not be supported by reasonable suspicion.' " *Baker*, 141 Idaho at 167, 107 P.3d at 1218.

The final allegedly coercive factor cited by the appellate court was that Officer Pate approached defendant's vehicle from the rear driver's side, instead of merely walking straight up to the window "as an ordinary citizen typically would." 357 Ill. App. 3d at 421. According to the appellate court, Officer Pate's angle of approach conveyed the following message to defendant: " 'I am interested in you and I will speak to you right now.' " 357 Ill. App. 3d at 421. The appellate court majority agreed with the dissenting justice's assertion that officers approach vehicles from the rear out of a concern for their

own safety. The appellate court concluded, however, that officer safety does not "immunize from constitutional scrutiny all actions taken in its name," and that Officer Pate's angle of approach showed that he was treating defendant as a dangerous subject. 357 Ill. App. 3d at 422-23.

As with the other two factors, the appellate court failed to cite any authority in support of its position. Defense counsel conceded at oral argument that he could cite no authority, other than the appellate court's 2-1 decision, for the proposition that a police officer effectuates a seizure by approaching a vehicle from the rear instead of from the side. We see nothing inherently coercive in Officer Pate's angle of approach, and we agree with the dissenting justice's observation that a private citizen's angle of approach to a vehicle would depend upon where he began his approach. In its *amicus* brief, the Fraternal Order of Police confirms that law enforcement officers are trained to approach automobiles from the rear driver's side because this method of approach provides the officer with the most protection. We disagree with the appellate court's conclusion that a police officer acts in a coercive manner simply because he approaches in a manner designed to enhance his own safety. Moreover, it is not true that Officer Pate's approach necessarily meant that he viewed defendant as a dangerous suspect. It seems obvious that officers are trained to approach *all* vehicles in this manner because they have no way of knowing when they will encounter a dangerous person. As with its position on the use of a flashlight, the appellate court would leave a police officer with a bad choice. Either he must stroll up to the side of the vehicle with no concern for his own safety, or he must approach from the rear driver's side and risk effectuating a detention that is not supported by a sufficient reasonable, articulable suspicion of criminal activity. Assuming that the police will always take their own safety into account, the appellate court's position would mean that *every* approach of a police officer to a vehicle will constitute a seizure. This is exactly the kind of result that Justice Stewart warned against in *Mendenhall*:

> "Moreover, characterizing every street encounter between a citizen and the police as a 'seizure,' while not enhancing any interest secured by the Fourth Amendment, would impose wholly unrealistic restrictions upon a wide variety of

legitimate law enforcement practices. The Court has on other occasions referred to the acknowledged need for police questioning as a tool in the effective enforcement of the criminal laws." *Mendenhall*, 466 U.S. at 554, 64 L. Ed. 2d at 509, 100 S. Ct. at 1877.

In sum, it is clear that Officer Pate did not effectuate a seizure of defendant before observing an open bottle and signs of defendant's intoxication. Rather, precedent shows that Officer Pate acted exactly as a well-trained police officer should when he wishes to question a person seated in a parked vehicle without effectuating a seizure. He drove past defendant's vehicle so as not to block it in its space. He did not turn on his overhead flashing lights to signal that defendant's compliance was expected. He did not use coercive language or a coercive tone of voice, he did not touch defendant, and he did not display his weapon. He approached from the rear driver's side, as he was trained to do, and he used a flashlight because it was nighttime. Objectively viewed, nothing Officer Pate did would communicate to a reasonable person, innocent of any wrongdoing, that he was not free to decline to answer Officer Pate's questions or otherwise go about his business. We reject the position of the appellate court that if an officer patrolling in the middle of the night sees something about a vehicle that appears out of the ordinary, he must walk casually up to the side window in the dark, with no concern for his own safety and no illumination, or be held to have committed a seizure. The touchstone of the fourth amendment is reasonableness (*United States v. Knights*, 534 U.S. 112, 118, 151 L. Ed. 2d 497, 505, 122 S. Ct. 587, 591 (2001)), and the consequences that would follow from the appellate court's opinion are not reasonable.

## CONCLUSION

Because no seizure occurred until after Officer Pate had a reasonable, articulable suspicion that defendant was intoxicated while in control of a motor vehicle, the circuit court erred in granting the motion to suppress. We therefore reverse the judgments of the appellate court and the circuit court and remand the cause to the circuit court for further proceedings.

*Appellate court judgment reversed*;

*circuit court judgment reversed*;
*cause remanded*.

JUSTICE BURKE took no part in the consideration or decision of this case.