2020 IL App (1st) 171490-U
No. 1-17-1490 & 1-17-1491 (cons.)
Order filed March 30, 2020

First Division

**NOTICE:** This order was filed under Supreme Court Rule 23 and may not be cited as precedent by any party except in the limited circumstances allowed under Rule 23(e)(1).

_____

IN THE

APPELLATE COURT OF ILLINOIS

FIRST DISTRICT

_____

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| | ) | Circuit Court of |
| Plaintiff-Appellee, | ) | Cook County. |
| | ) | |
| v. | ) | Nos. 15 CR 1923 |
| | ) | 15 CR 1924 |
| | ) | |
| EVERETT VAUGHN, | ) | Honorable |
| | ) | James M. Obbish, |
| Defendant-Appellant. | ) | Judge, presiding. |

_____

JUSTICE HYMAN delivered the judgment of the court.
Presiding Justice Griffin and Justice Walker concurred in the judgment.

**ORDER**

¶ 1    *Held*:  We affirm defendant's convictions for armed robbery where (i) defendant's motions to suppress evidence were properly denied by the trial court; and (ii) defendant's concurrent 27- year sentences were not excessive.

¶ 2    After a simultaneous bench trial on two cases for armed robbery with a firearm, the trial judge found Everett Vaughn guilty twice and sentenced him to 27 years' imprisonment in each case, to be served concurrently. Vaughn appeals the convictions. We granted leave to consolidate the appeals. Vaughn argues (i) the trial court erred in denying his motions to suppress evidence

because his girlfriend's consent to police to search her apartment was given involuntarily; and (ii) Vaughn's 27-year sentence is excessive given his lack of a prior criminal background. We affirm. We find the trial court's ruling on the voluntariness was not "clearly unreasonable." As to his sentence, we conclude that Vaughn has not shown the court failed to give the proper weight to his lack of a criminal record, especially where the evidence showed the seriousness of the robberies.

¶ 3                                                  Background

¶ 4      The charges stem from two separate armed robberies at a Circle K gas station on Van Buren Street. In case no. 15 CR 1923, Vaughn was charged with two counts of armed robbery with a firearm (720 ILCS 5/18-2(a)(2) (West 2014)) of Claudia Szczerba and Daniel Caguana, two counts of aggravated unlawful restraint of Szczerba and Caguana, and three counts of aggravated unlawful use of a weapon, arising from a robbery on January 14, 2015. In case no. 15 CR 1924, Vaughn was charged with one count of armed robbery with a firearm of Szczerba, one count of aggravated unlawful restraint of Szczerba, and three counts of aggravated unlawful use of a weapon, arising from a robbery on November 3, 2014. The parties agreed the cases would be tried together.

¶ 5      In both cases, Vaughn filed motions to suppress evidence recovered during a search of the apartment of Matrice Vaughn, his girlfriend, arguing her consent to the search was coerced and involuntary. Although they are not related, Vaughn shares the same last name as Matrice. At the hearing on the motions, Matrice testified she was Vaughn's girlfriend in 2014 and early 2015, and Vaughn lived at her apartment during that time. While he lived with her, Vaughn stored "some duffle bags" on the floor of her bedroom next to the bed. He did not "let" her look inside the bags, and she did not know what was inside of them.

¶ 6      On January 20, 2015, Matrice owned a car, a red PT cruiser, which she had given Vaughn

permission to use. On that day, he had been using her car and was supposed to pick up her daughter from school. That afternoon, the school called and told her that Vaughn was in jail. To retrieve her car, she went to the police station holding Vaughn. Detectives brought her into a room, and she sat at a long table. She saw photographs of herself, her ex-boyfriend, and Vaughn on the table. The detectives asked her about Vaughn and their relationship. They showed her a video of a man with a gun robbing a gas station, and a video of her car leaving the gas station. The detectives told her they thought Vaughn was the person who robbed the gas station and asked if she knew anything regarding Vaughn's activities. She said she did not.

¶ 7     The detectives then told her that although her car was evidence, they had "no problem" giving it back to her. The detectives also told her "a few things about [herself]," including that she worked a full-time job and that she had financed her car. They then said "if [she] let them search [her] house, go in [her] house, then *** [she] won't be in any trouble." And, "we know that you have kids. We don't want you to be in any trouble. We don't think you are involved. You [*sic*] never been in trouble before." The detectives said "if they find anything in [her] house, that [she] would be responsible. And there is a possibility that *** [her] children will get took and [she will] get in trouble." The officers "basically said if [Matrice] let them search [her] house, [she] won't get in trouble. They said if [she signed] this paper, then they can search [her] house and [she] won't be accountable for anything they find." They did not tell her what would happen if she refused to sign.

¶ 8     Vaughn submitted a consent to search form signed by Matrice Vaughn into evidence. The form indicated she had been advised of her constitutional rights to refuse to consent to a warrantless search, and authorized Officers Considine and Reszutko to conduct a search of her apartment. The

names of the officers and the description of the premises were handwritten on the form. Her name had been handwritten at the top of the page and her signature and the date "1/20/15 at 11:35 p.m." appeared at the bottom. She did not recall whether the blanks had already been filled in on the form when she received it. The form was not read to her; she did not read it. She printed her name at the top, signed the bottom to allow the search, and understood what she was doing when she signed.

¶ 9 Then the police officers gave her the car keys and followed her to her apartment. She was present when the police searched the duffle bags. The police officers showed her what they found in the duffle bags.

¶ 10 On cross-examination, she testified she was not told she had to come to the police station. She went to get her car. When she arrived, the police officers did not handcuff her, and she never felt as though she were under arrest. After she spoke with the officers, she signed the consent to search form because she had nothing to hide and had done nothing wrong. She acknowledged the form stated she did not have to consent.

¶ 11 At the time, she had not been dating Vaughn for long, but had known him before dating. By trial, they were no longer in a relationship. She showed the officers where the duffle bags were located, and the officers did not search any other part of the apartment, did not wake her children, and were respectful of her property. She did not know that the duffle bags contained guns.

¶ 12 After the officers recovered the duffle bags, she returned with them to the police station where she spoke with an assistant state's attorney and gave a handwritten statement. The assistant state's attorney asked her how she had been treated by the police and she responded she "had been treated pretty nice." She said "nobody forced [her], there were no threats or promises made to

[her]" to give [the] handwritten statement. Her statement was not admitted into evidence or is it in the record on appeal.

¶ 13     On redirect examination, Matrice testified that, when the police "were going over" the consent to search form, they did not read the form to her or tell her she did not have to give them consent. After police showed her the photographs and videos, she worried she might be in trouble and wanted to cooperate so she would not be held responsible "for this." Police told her "cooperation would be good." Before she signed the form, the police officers told her they were looking for a gun and, if they found a gun, "it could be a possibility that [she] get in trouble" because it was in her apartment.

¶ 14     The court granted the State's motion for a directed finding, ruling the evidence, taken in a light most favorable to Vaughn, "fell far short" of demonstrating coercive tactics or threats to get Matrice Vaughn to sign the consent to search form. The police showing her the videos of the armed robberies did not amount to coercion, and was a "display of the evidence to try to alert this young lady * * * of the dangerous nature of the relationship she had with the person that they were alleging committed these armed robberies." The court found the police officers "didn't threaten her," "didn't coerce her," and "pretty much could not have been nicer to her."

¶ 15     The court noted the officers told her (i) they did not believe she was involved, (ii) she had children, and (iii) they wanted to inspect her apartment to see if there were any proceeds of the armed robberies there because she did not want to be held responsible for hiding evidence. The court stated she signed the form indicating she did not have to give consent to a warrantless search and authorizing the search. The form also indicated that by signing it, she "state[d] and certif[ied]" that she knowingly and voluntarily gave consent to search without being threatened or promised

anything. The court held that the police did not set up a coercive environment, did not restrain her liberty, and searched only the duffle bags she told them about. The court concluded that the officers "just put it all out there," likely to convince her it was the right action to take but their conduct did not create a coercive atmosphere to induce signing the consent form.

¶ 16 At trial, Claudia Szczerba testified that in November 2014, she worked as a cashier at the Circle K gas station on West Van Buren Street, and in January 2015, she had been promoted to manager. Just before 8:00 p.m. on November 3, 2014, Szczerba was behind the counter when a man came in holding a gun. The man wore a hat, hoodie, black and white Air Jordan sneakers, and a construction vest. She identified the man's clothing. When the man first entered, he was not wearing a mask, so Szczerba saw his face. The man put on a face mask "when he's about to reach in with the gun." He "clocked the gun," leaned over the counter, put down a green pillowcase, and told Szczerba to place the money from the register in the bag and get down on the floor. She did as instructed. The man also asked for cigarettes but left before she handed them over.

¶ 17 Szczerba had seen guns and shot them at the police academy, so she was familiar with semiautomatic weapons. She heard the man rack the slide of the gun and recognized the sound. Szczerba identified a gun in court as the gun pointed "into her face." When the court pulled the slide back on the gun, she identified the sounds as the same she heard the man's gun make.

The State published surveillance video showing the November 3, 2014, robbery from multiple angles. Szczerba said the video accurately depicted the events of the night. (Although the record on appeal includes a DVD containing the November 3, 2014, the court was unable to review the clips. This court could review two DVDs with video clips of the January 14, 2015, robbery.)

¶ 18 On January 14, 2015, Szczerba was working at the gas station shortly after 8:15 p.m., and

a friend, Daniel Caguana, was with her. Szczerba was cleaning the bathroom when the door sounded, indicating someone opening the front door. She saw a man wearing a face mask, a construction vest, and a hoodie with the hood over his head, come in holding a gun. He said, "you already know what time it is, pointed the gun at Caguana, and then said, "if you f****** move I'll f****** blow – or I'll kill you." With the gun "in [her] face," Szczerba gave him money from the register.

The man then asked for cigarettes. When Szczerba asked him what kind of cigarettes he wanted, the man told her "well, I'm black, what do you think I smoke?" Szczerba understood this to mean he Newport cigarettes but purposely gave him the wrong brand. When the man left the store, Szczerba followed him but came back inside when he waved the gun at her. She saw the man get into a red PT Cruiser and drive off. She ran out of the store again and followed the car, calling 911 on her cell phone. When the car stopped at a red light, Szczerba relayed the car's year and make and a partial license plate number.

Szczerba was unable to see the man's face because of the face mask but said she would never forget his eyes. When police officers showed her photographs, she recognized the man as the same man who committed the November robbery. Szczerba identified the face mask, gun, and construction vest used in the robbery and confirmed the gun was the same gun used in the November robbery.

The State played multiple surveillance video recordings showing interior and exterior views of the Circle K gas station during the January 14, 2015, robbery. Szczerba testified the video clips were accurate depictions of the events of the January robbery. (It is unclear which of the January 14, 2015, video recordings included in the record were played at trial. This court reviewed

all the recordings.)

¶ 19    On cross-examination, Szczerba acknowledged that after the November 2014 robbery, she believed the gun may have looked like a .22 caliber but did not recall telling that to the investigating officer. Szczerba had entered the police academy and had seen and fired only "[n]ine millimeters." She did not recall telling the investigating officer whether she heard the man rack the slide and did not see him pulling it back in the surveillance video, but the man was in front of her when he did it, so the cameras may not have been able to view that angle.

¶ 20    After the January robbery, Szczerba told the investigating officer the man pulled the slide back as he was entering and pointed the gun at Caguana. After the robber left the store, Szczerba ran out twice, because after the first time the man pointed a gun at her and she ran inside to take cover, but the second time she ran out and was able to view the license plate.

¶ 21    Daniel Caguana testified that on January 14, 2015, at 8:15 p.m., he was at the Circle K gas station, "hanging out" with the cashier, Szczerba, whom he knew. Caguana was standing about five to six feet away from the door with an unobstructed view when a man walked in and stood next to the register. The man wore a gray hoodie, a "lime green, yellowish" construction vest, nice gym shoes, and jeans. Caguana could only see the man's eyes, since he was wearing a mask "covering up to his nose." The man pulled out a dark silver, chrome gun, "cocked it back," started "waving it around, pointing it," and said, "you know what time it is." He pointed the gun at Caguana, and said "if you move, I'll shoot."

¶ 22    The man asked for cash and a pack of Newport cigarettes, and then walked out and headed toward Van Buren Street, at which point Caguana and Szczerba followed to see where the man was going. They called police and watched the man get into a red PT cruiser, which went north on

Van Buren. Caguana testified surveillance footage from the Circle K gas station accurately depicted the events.

¶ 23    On cross-examination, Caguana said police officers asked him to make an identification but he identified "the wrong person" in a photo array. Caguana was "not sure" whether Vaughn was the man he saw wearing the construction vest in the gas station.

¶ 24    Police sergeant John Considine testified that, on January 20, 2015, he was working with his partner Ken Reszutko on a "string of armed robberies" at the Circle K gas station on Van Buren Street. Considine saw a red PT cruiser with a license plate that matched the description of the car involved in the robberies. The driver matched the description of the offender. Considine and Reszutko curbed the car and arrested the driver, whom he identified in court as Vaughn. Inside the car, the officers found packaging for a half-face mask, which he identified in court.

¶ 25    After Vaughn had been taken into custody, Considine met with Matrice Vaughn at the police station and was present when she was asked to consent to a search of her apartment. After she signed the consent form, she drove her car to her apartment. Considine followed. She let the officers into her apartment and. directed them to the bedroom where she and Vaughn "stayed" and to bags containing Vaughn's belongings. Considine searched the bags in her presence. Considine identified a yellow and orange construction vest, blue-green pillowcase, half-face mask, bb gun, and firearm as items he recovered. He identified a hat, hooded sweatshirt, and Air Jordan sneakers as items recovered from the bedroom. When he recovered the firearm, it was loaded and had one bullet in the chamber.

¶ 26    On cross-examination, Considine stated he told Matrice he thought there might be firearms at her house, did not have a search warrant, and would like her to consent to the search. Considine

told her "what the consequences would be" if she did not consent, namely, that the officers could "legally get a search warrant." Considine did not recall telling her what would happen if he found anything in her home and she had not given consent.

¶ 27    Matrice testified that between November 2014 to January 2015, she had known Vaughn "a little bit over a year" and had been dating him since the summer of 2014. They broke up "[a]round the time he went to jail." While they were dating, Vaughn lived with her and kept his belongings inside three or four bags which he kept on the floor of her bedroom. She never looked inside the bags, because Vaughn told her "[n]ot to touch them." During that time, she was the sole owner of a red PT cruiser, which she allowed Vaughn to use.

¶ 28    On January 20, 2015, she learned from her daughter's school that Vaughn would be unable to get her daughter from school. Having determined Vaughn and her red PT cruiser were at a police station, she went there and learned of Vaughn's arrest. She did not know why. She spoke with police officers and a detective who showed her videos of events which took place at a Circle K gas station on November 3, 2014, and January 14, 2015. She had given Vaughn permission to use her car on those days and saw Vaughn and her car in the videos for both dates. She told police she recognized her car. They asked her if they could search inside her apartment and showed her a consent to search form. The officers said they wanted to search for weapons. She did "[n]ot entirely" read the form but did read it "a little bit," and then signed it.

¶ 29    She went to her apartment. Officers followed her.  She showed them Vaughn's bags. The officers searched the bags in her presence. She saw them remove a yellow construction vest, a pillowcase, a mask, plastic gloves, and two guns, one of which the officer characterized as a "fake**."** The officers unloaded the real gun. She had seen the construction vest before in the trunk

of her car. When she asked Vaughn about it, he told her "none of your business." She identified the items removed from the bags, as well as a gray hoodie, gym shoes, security officer badge, and hat belonging to Vaughn, all of which had been recovered from her bedroom. She said Vaughn smoked Newport cigarettes.

¶ 30    On cross-examination, Matrice said she got her car back after the police recovered the items from her apartment, and she had returned to the station. Before she signed the consent form, the police told her they wanted to search her home; they believed firearms were there. The police did not say they whether they had a search warrant. They told her she could possibly "get in trouble for a gun" if she did not sign the form. This influenced her to sign. Police also did not say that if she refused consent and guns were found, she would be held responsible for them.

¶ 31    On redirect examination, she testified that when police told her that weapons could be in her apartment, she wanted them to search for weapons because she had children. She did not know there were guns in the apartment and went with the police voluntarily. When police showed her the video of the two robberies, she recognized Vaughn as the robber. When the State showed her a frozen still from the surveillance footage, she identified Vaughn as well as his gray sweatshirt, the construction vest, and face mask. She also recognized her car in the surveillance footage.

¶ 32    Detective Steve Buglio testified he investigated the two armed robberies of the Circle K gas station and had the partial plate information and car description of the red PT Cruiser. The partial plate was registered to a car belonging to a "Latrice" Vaughn, which got a ticket in November 2014. Buglio passed the information to Chicago police officers Considine and Reszutko. They stopped a car matching that description on January 20, 2015, and arrested the driver. Buglio interviewed the driver at the police station, whom he identified in court as Vaughn.

¶ 33    After advising Vaughn of his rights, Buglio asked him questions concerning the PT Cruiser. Vaughn said his girlfriend "Latrice" owned the car and he was the only man who drove the car. After the initial conversation, Buglio received information from Considine and Reszutko regarding clothing, a weapon, and mask packaging recovered from the apartment and the car. Buglio showed Vaughn the vest, hat, and shoes and "a couple of clips" of the surveillance videos from the robberies. When Buglio showed Vaughn the clip from the January 2015 robbery, Vaughn said, "yeah that's me."

¶ 34    On cross-examination, Buglio said Vaughn did not sign a written statement, and he did not show Vaughn the weapons. Vaughn did not say which weapons were used in either robbery. Vaughn told Buglio he did not remember other robberies, "but that he was snorting a lot at that time period." This statement was not recorded.

¶ 35    The court granted Vaughn's motion for a directed verdict in part, acquitting Vaughn of the armed robbery of Caguana and three counts of aggravated unlawful use of a weapon in case no. 15 CR 1923, and all three aggravated unlawful use of a weapon charges in case no. 15 CR 1924.

¶ 36    Vaughn then proceeded by way of stipulation. If called to testify, Chicago police officer Jacquelin Gregory would testify she interviewed Claudia Szczerba about the November 3, 2014, robbery. Szczerba described the gun as a "small black gun" and believed it was .22 caliber. Gregory's police report did not say Szczerba told her the offender "racked the slide" during the robbery. The parties also stipulated that, if called to testify, Chicago police officer Laura Bragiel would testify she interviewed Szczerba regarding the January 14, 2015 robbery. Szczerba described the firearm used by the offender as a "chrome handgun" and she did not write in her police report that Szczerba told her the offender "racked the slide" during the robbery. Vaughn

rested without presenting any further evidence.

¶ 37    The court found Vaughn guilty of the armed robbery of Szczerba in both cases, the aggravated unlawful restraint of Szczerba and Caguana in case no. 15 CR. 1923, and the aggravated unlawful restraint of Szczerba in case no. 15 CR 1924, holding the counts in each case merged for purposes of sentencing. In ruling, the court found Szczerba was an "extraordinarily credible witness," and almost everything to which she testified had been corroborated by the videos. The court stated it examined the firearm identified by Szczerba and it was operable, and Szczerba described the sound of Vaughn pulling the slide back on the gun to chamber a bullet.

¶ 38    The trial court acknowledged minor impeachment of Szczerba but found, "even taking that impeachment into consideration," she was a credible witness. The court stated police officers only make a "quick report" and invariably some witness testimony is left out. The court concluded, "[t]he evidence against [Vaughn] is so strong. It's one of the strongest cases that's ever been put forth probably in this building." After ruling, the court addressed Vaughn directly, noting for the record that Vaughn had been "smirk[ing] and laugh[ing]" during the State's argument when it was displaying the physical evidence against him.

¶ 39    Vaughn filed motions for a new trial, arguing, in part, that the court erred in denying his motion to suppress evidence. The motions were denied. Vaughn's presentence investigation report showed no prior juvenile or adult convictions. Vaughn reported his childhood was "normal," and his relationship with his father had been "good," and his relationship with his mother was "very good." Vaughn was in a seven-year relationship with a woman and they had a daughter and he had a second daughter from another relationship. Vaughn denied affiliation with a street gang and any substance use other than alcohol and marijuana.

¶ 40    In aggravation, the State called Omar Breton, the victim of a third armed robbery, case no. 15 CR 1925. The State argued that the testimony and video evidence regarding this robbery "shows how dangerous this Vaughn was" because he fired a gun. The State argued that, while Vaughn did not have any prior felony convictions, armed robbery carried "a significant sentence." The State urged the court to consider all the testimony from the victims at trial and the sentencing hearing and sentence Vaughn over the statutory minimum.

¶ 41    In mitigation, defense counsel argued the third armed robbery victim's identification of Vaughn was faulty for various reasons, and Vaughn likely accidentally fired the gun because the victim had pushed a "display case" onto him. He added that Vaughn had been a law-abiding citizen for many years, and something must have happened in his life that caused him to rob gas stations. Counsel argued Vaughn's lack of criminal history, the support of his family, and that nobody was hurt during the robberies. All this warranted sentencing him to the "low end" of the range.

¶ 42    In allocation, Vaughn apologized for his behavior during the last court appearance. The court told Vaughn it would not hold his behavior against him.

¶ 43    The court sentenced Vaughn to concurrent 30-year sentences on the armed robbery counts in each case, noting Vaughn's lack of criminal history and that he did not appear to come from an "environment of people that would regularly engage in criminal behavior." The court stated Matrice Vaughn seemed like an "extraordinarily decent model citizen," who had been "taken in and duped by what the Vaughn was really doing" when he used her car and stored his armed robbery tools.

¶ 44    The court noted Vaughn's argument that firing the gun during the third robbery could have been unintentional, but found "the real aggravating factor" was that Vaughn had been armed with

a real firearm, loaded with live ammunition and one bullet chambered at the time of the robbery, and that the firearm was fired. This showed the "inherent dangerousness" of an armed robbery and the third robbery was "just a slight finger pull away from a murder." Stating it considered all matters in aggravation and mitigation, the court considered neither the minimum nor maximum sentence appropriate and sentenced Vaughn to concurrent 30-year terms. After the sentencing hearing, the State *nol-prossed* the charges in the third armed robbery case, no. 15 CR 1925.

¶ 45　Vaughn filed motions to reduce sentence, arguing the trial court abused its discretion in imposing 30-year sentences for armed robbery with a firearm. He argued the sentences were "greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense," and the court improperly balanced the factors in aggravation and mitigation.

¶ 46　The court reconsidered the sentences, emphasizing the witness from the third armed robbery, presented in aggravation, testified that a gun in Vaughn's hand discharged during that robbery. Because of this testimony, the court found "there wasn't a lot mitigating with respect to [Vaughn's] behavior here." The court commented "[t]he only thing that is mitigating is [Vaughn] does not have any prior convictions." Vaughn behaved as a person "living in some sort of dream world" while reacting in court to the strong evidence against him, which the court found did not benefit his case. Nevertheless, the court granted Vaughn's motions and reduced Vaughn's sentences to 27 years in each case, to be served concurrently.

¶ 47　　　　　　　　　　　　　　Analysis

¶ 48　　　　　　　　　　　Motions to Suppress Evidence

¶ 49　Vaughn first argues for us to reverse the denial of his motions to suppress evidence and remand for a new trial. He maintains that the evidence from the search "played a key role" in the

convictions, and the consent to search the apartment had been obtained involuntarily.

¶ 50     We review rulings on motions to suppress evidence under a two-part standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). A trial court's findings of fact are reviewed for clear error and will be reversed only if they are against the manifest weight of the evidence**. *Id*. "A reviewing court, however, remains free to undertake its own assessment of the facts in relation to the issues and may draw its own conclusions when deciding what relief should be granted." *Id*. So we review *de novo* the legal ruling on whether suppression is warranted. *Id*.

¶ 51     Searches normally require a warrant supporting probable cause. U.S. Const., amend. IV. Nonetheless, courts allow warrantless searches in limited situations, including where consent has been given voluntarily without duress or coercion. *Schneckloth v. Bustamante*, 412 U.S. 218, 219 (1973); *People v. Anthony*, 198 Ill. 2d 194, 202 (2001) ("Consent must be received, not extracted 'by explicit or implicit means, by implied threat or covert force.'" (quoting *Schneckloth*, 412 U.S. at 229).

¶ 52     The State has the burden to show by a preponderance of the evidence that consent was voluntarily given. *People v. Casazza*, 144 Ill. 2d 414, 417 (1991). Voluntariness depends on the totality of the circumstances. *Id*. Consent cannot result from express or implied coercion, intimidation, or deception and cannot be the result of "acquiescence or submission to the assertion of lawful police authority." *People v. Buschauer*, 2016 IL App (1st) 142766, ¶ 38. That a written consent form was signed does not necessarily mean voluntariness when circumstances show coercion. *People v. Wall*, 2016 IL App (5th) 140596, ¶ 14. We will reverse the trial court's determination on voluntariness when it is "clearly unreasonable." *Casazza*, 144 Ill. 2d at 417-18.

¶ 53     Vaughn contends the officers' statements to Matrice at the police station were "deceptive,"

"misleading," and "based on the unsavory but time-honored practice of threatening to take a woman's children away to get her to comply with law enforcement." Vaughn made substantially the same argument during the suppression hearing. There, the trial court heard Matrice testify on what the police officers told her to persuade her to sign the consent form, and found it "fell far short" of actual coercive tactics and At the suppression hearing, amounted to a "display of the evidence" to convince her of the dangerous situation with which she was involved. We agree.

¶ 54     At the suppression hearing, Matrice Vaughn testified she had been worried she might be in trouble with the police and wanted to cooperate so she would not be held responsible for any illegal activities Vaughn may have committed. The police told her they were looking for a gun, for which she could "get in trouble" if located in her apartment.  The trial court determined the police officers conducted themselves "respectful[ly]," and signing the consent form was "entirely reasonable" based on what she had learned. We find the State has carried its burden to show the consent had been voluntarily given. The totality of the circumstances show that (i) Matrice never believed she was under arrest, (ii) the police told her they did not believe she was involved in any illegal activities, (iii) she had the keys to her car returned to her, (iv) she signed the consent to search form, and (v) the form, which she read "a little bit," stated she did not have to consent to the search. See *Casazza*, 144 Ill. 2d at 417.

¶ 55     Further, evidence at trial may be considered by the reviewing court on whether to sustain the decision to deny a motion to suppress. *People v. Caballero*, 102 Ill. 2d 23, 34-36 (1984). At trial Matrice testified not only that she went voluntarily with the police to her apartment, but, after the police officers told her Vaughn may have kept guns at her apartment, she wanted the officers to search for guns because she had children. Her trial testimony supports the trial court's ruling

that Matrice voluntarily consented to the search of the duffle bags due to her concern about the guns and the possible ramifications for her and her children.

¶ 56    Citing *People v. Purchase*, 214 Ill. App. 3d 152 (1991), and *People v. Daugherty*, 161 Ill. App. 3d 394 (1987), Vaughn argues the officers were "deceptive and misleading" and threatened to take Matrice's children away. Both cases are distinguishable.

¶ 57    In *Purchase*, the appellate court affirmed suppression of all evidence seized during a search based on considerable evidence that the consents signed by the defendant and his wife "were obtained through coercion and trickery." *Purchase*, 214 Ill. App. 3d at 154-55. Police officers informed the wife, who was pregnant and home alone, that "if she did not cooperate, they would put her in jail and take custody of her baby" and led her to believe they had a search warrant. *Id.* at 153. They had no warrant and caused the wife to believe that unless she cooperated by signing the consent form, the officers could take her to jail and make her baby a ward of the court. *Id.* Also, the officers covered up the form's top portion and told her signing the "piece of paper" would show her cooperation. *Id.* The trial court granted the suppression motion because the police officers placed the wife in a "very coercive and duressful [*sic*] environment," and she had "no choice" but to sign a form she did not understand. *Id.* at 154-155. Under these circumstances, the trial court's determination was not manifestly erroneous. *Id.* at 155.

¶ 58    In *Daughtery*, this court affirmed the suppression of all evidence seized from and statements made by the defendant. The trial court found police used improper subterfuge to obtain consent from defendant's wife to enter their home. *Daugherty*, 161 Ill. App. 3d at 395, 400. A police officer told the wife that he had questions regarding a theft of money from her house, a theft which the wife felt had already been resolved. *Id.* at 396. Based on information he received in

reviewing the theft case, the officer had gone to the home not only to talk about the theft report but to find out if there were drugs or marijuana there. *Id*. The officer "ordered" the wife to show him from where the money had been taken and where other money was kept. *Id.* When she took him into the kitchen, he saw marijuana on the counter and seized it. *Id.* When the officer threatened to take her children if she did not cooperate, she turned over more marijuana. *Id.* The officer did not have a search warrant and did not ask the wife to sign a consent form. Defendant was convicted of possession of marijuana. *Id.* at 397. The trial court found the wife's consent invalid as it was given only because of the officer's ruse about investigating the theft. *Id*. This court agreed, finding the officer's use of his "official position of authority" to falsely claim legitimate police business to search for evidence of another crime rendered the subterfuge "so unfair as to be coercive and renders the consent[to enter] invalid." *Id*. at 400.

¶ 59    Unlike in *Purchase* and *Daugherty*, the police officers here did not engage in coercion or subterfuge to obtain consent. They did not make false threats to put Matrice in jail or to take away her children as in *Purchase* and *Daugherty*. They did not use their official position of authority or trickery to obtain consent by hiding the real reason for their request as in *Daugherty*. Rather, the officers informed her of potential, legitimate consequences should she be found to be involved with Vaughn's criminal activities or should firearms be found. They informed her that she could be found responsible for the guns, and there existed a "possibility" her children could be taken should that happen, an accurate assessment.

¶ 60    Unlike the wives in *Purchase* and *Daugherty*, Matrice knowingly signed a consent to search form, testifying she read the form in part and wanted the police to search for firearms in her home because of her children's presence. The police officers' actions in attempting to convince

her to allow the search did not rise to the level of duress or coercion as in *Purchase* and *Daugherty*.

¶ 61   We affirm the trial court's denial of the motions to suppress evidence.

¶ 62                                    Sentence

¶ 63   Vaughn contends that his 27-year sentence is excessive because the trial court failed to adequately weigh the mitigating evidence of Vaughn's lack of a criminal background, the events at issue were "short in duration, and no one was hurt," and the negative impact of Vaughn's lengthy incarceration would be felt by his children. Vaughn requests that we reduce his sentence to the minimum term of 21 years.

¶ 64   We review a sentencing decision under the abuse of discretion standard of review. *People v. Alexander*, 239 Ill. 2d 205, 212 (2010). A reviewing court will find an abuse of discretion where the sentence is "'greatly at variance with the spirit and purpose of the law, or manifestly disproportionate to the nature of the offense.'" *Id*. The trial court has broad discretion in imposing a sentence as the trial judge "observed the defendant and the proceedings," and can better weigh factors such as defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. *Id*. But, we interpret sentencing laws "in accord with common sense and reason" and not merely rubber stamp the trial court's judgment, so as to "avoid an absurd or unduly harsh sentence." *People v. Allen*, 2017 IL App (1st) 151540, ¶ 1.

¶ 65   Vaughn was convicted of armed robbery with a firearm, a Class X offense, for which 15 years shall be added to the sentence, resulting in a range of 21 to 45 years' imprisonment. 720 ILCS 5/18-2(a)(2), (b) (West 2014); 730 ILCS 5/5-4.5-25(a) (West 2014). Vaughn's 27-year sentence, which falls within the sentencing range is presumed proper. *Knox*, 2014 IL App (1st) 120349, ¶ 46.

¶ 66     A sentence should reflect both the seriousness of the offense and the objective of restoring the offender to useful citizenship. Ill. Const. 1970, art. I § 11; *People v. Neasom*, 2017 IL App (1st) 143875, ¶ 48. While a trial court must consider all factors in aggravation and mitigation, the seriousness of the offense is the most important factor in sentencing rather than the mitigating evidence. *People v. Kelley*, 2015 IL App (1st) 132782, ¶ 94. The trial court is presumed to consider "all relevant factors and any mitigation evidence presented" (*People v. Jackson*, 2014 IL App (1st) 123258, ¶ 48), but has no obligation to recite and assign a value to each factor (*People v. Perkins*, 408 Ill. App. 3d 752, 763 (2011)). Rather, the defendant must make an affirmative showing that the court did not consider the relevant sentencing factors. *People v. Burton*, 2015 IL App (1st) 131600, ¶ 38.

¶ 67     Vaughn does not satisfy that showing. He appears to argue that, because he had no prior criminal record and did not injure anyone during either charged robbery, any sentence imposed above the 21 years' minimum would be excessive. Sentencing decisions, however, are subject to the court's discretion and the trial court found it extremely relevant that Vaughn was armed with a loaded firearm which discharged during the third robbery. While Vaughn characterizes the armed robberies as not causing physical harm, the court emphasized that Vaughn, who used a firearm in all three robberies, had been only a "trigger pull" away from causing a murder during the third robbery. See *Kelly*, 2015 IL App (1st) 132782, ¶ 94 ("'The seriousness of the crime is the most important factor in determining an appropriate sentence, not the presence of mitigating factors such as the lack of a prior record.'") (quoting *People v. Quintana*, 332 Ill. App. 3d 96, 109 (2002)).

¶ 68     Further, the record shows the trial court specifically considered Vaughn's lack of a criminal background, commenting on his lack of a criminal background as well as his education and work

histories when initially sentencing him. Then, in response to Vaughn's motion to reconsider the sentence, the court reduced the sentences to 27-year terms based on Vaughn's lack of a prior criminal record, the only relevant mitigating evidence presented in the motion. This reflects the trial court's acknowledgment of the weight of this mitigating evidence in its sentencing decision.

¶ 69     Vaughn also argues the trial court failed to consider the negative effects of incarceration on Vaughn and his children. See 730 ILCS 5/5-5-3.1(a)(11) (West 2014). The trial court reviewed the PSI and, in the absence of evidence to the contrary, we will presume that the trial court considered the relationship between Vaughn and his children and any negative effects of incarceration. See *People v. Gordon*, 2016 IL App (1st) 134004, ¶ 51; *Jackson*, 2014 IL App (1st) 123258, ¶ 48.

¶ 70     In sum, we conclude that the trial court did not abuse its discretion in imposing concurrent 27-year sentences for each of the charged robberies.

¶ 71     Affirmed.