2022 IL App (2d) 210721-U
No. 2-21-0721
Order filed July 21, 2022

**NOTICE:** This order was filed under Supreme Court Rule 23(b) and is not precedent except in the limited circumstances allowed under Rule 23(e)(l).

IN THE

APPELLATE COURT OF ILLINOIS

SECOND DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) | Appeal from the Circuit Court of Kendall County. |
| | ) | |
| Plaintiff-Appellee, | ) | |
| | ) | |
| v. | ) | No. 21-DT-83 |
| | ) | |
| MICHAEL A. LAMANTIA, | ) | Honorable |
| | ) | Stephanie P. Klein, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE HUDSON delivered the judgment of the court.
Presiding Justice Bridges and Justice Birkett concurred in the judgment.

**ORDER**

¶ 1    *Held*:   Denial of defendant's petition to rescind his driver's license suspension was proper where (1) the officer's approaching and speaking to defendant while his car was stopped along the road was not a seizure, and (2) the officer had reasonable suspicion to justify asking defendant to perform field sobriety tests, based on reports of defendant's erratic driving and the officer's own observations of defendant's detachment from his surroundings and his slow and confused answers to the officer's questions

¶ 2    Defendant, Michael A. Lamantia, appeals from an order of the circuit court of Kendall

County denying his petition to rescind the summary suspension of his driver's license. We affirm.

¶ 3                                    I. BACKGROUND

¶ 4    On May 15, 2021, defendant was arrested and charged by citation and complaint with driving under the influence of a drug or combination of drugs to a degree that rendered him incapable of safely driving (DUI) (625 ILCS 5/11-501(a)(4) (West 2020)). Because defendant subsequently refused to submit to, or failed to complete, chemical tests to determine the alcohol or drug content of his blood, breath, urine, or another bodily substance, his driver's license was summarily suspended for three years, effective July 2, 2021. See *id.* § 11-501.1(d).

¶ 5    On July 23, 2021, defendant filed a petition to rescind the summary suspension of his driver's license.[1] Defendant argued that the arresting officer detained him without having reasonable grounds to believe that he had committed or was committing the offense of DUI.

¶ 6    At the hearing, Village of Montgomery police officer Jesse Lankard testified that, at about 11:42 p.m. on May 15, 2021, he was advised by "KenCom, the dispatch unit," of a potential reckless driver. KenCom identified "several locations in the Village of Montgomery." KenCom initially advised Lankard that the driver "came out on Route 31 and Mill, passing Caterpillar Drive on Route 31 going northbound." The last location received by Lankard was that the vehicle was "going on the Route 31 bypass onto Route 30, traveling westbound." Upon learning that the vehicle was entering his area of patrol, Lankard began to search Route 30 for the vehicle. Lankard located a Dodge Ram and a silver Mercedes "near Route 30 and Dixon." The Dodge Ram was parked on the side of Route 30. The Mercedes was parked on the shoulder of Dixon across from the Dodge Ram. Lankard did not make any contact with the occupants of the Dodge Ram at that time; he contacted them by phone the next day.

---

[1]Defendant also filed a "Motion to Quash Arrest," which was heard and denied in conjunction with his petition to rescind. Defendant does not appeal from the denial of this motion.

¶ 7    Lankard testified that he pulled his squad car behind the Mercedes. Lankard "activated [his] rear emergency lights to advise traffic behind [him]." He also "activated [his] spotlight to illuminate the interior of the vehicle since it was dark outside." Lankard explained that the spotlight was "directed at the driver's side mirror." At that point, Lankard had not observed the driver of the Mercedes commit any traffic violations. Lankard "notified other units of [his] location, and [he] approached the driver's side also using [his] flashlight to observe the inside of the vehicle for safety reasons." According to Lankard, he "was conducting a motorist assist to check on the vehicle and the occupant to make sure they were okay, based off the statements that were made by KenCom." Lankard testified that, at that point, defendant was "free to leave" and that "[t]here was no traffic stop." Lankard explained that he activated his vehicle's rear emergency lights "just to advise any oncoming traffic of [the] vehicles off the side of the roadway."

¶ 8    Lankard testified that, when he approached the Mercedes, he observed defendant "looking down at his phone." Lankard could not see the phone's screen; he could only observe that the phone was on. Defendant did not notice Lankard until after Lankard tapped on the window. Lankard testified: "With the spotlight and my flashlight, [defendant] was still looking down at his phone. When I tapped on the window, he kind of almost jerked up, like looking at me." Defendant told Lankard that he was making a phone call. Lankard asked defendant if he was okay, and defendant told him that he was "fine." Lankard asked defendant if he had his driver's license, and defendant provided it to him. Lankard did not observe any odor of alcohol coming from the vehicle. Lankard observed that defendant "kind of had a slow, kind of confused speech." Lankard asked defendant where he was going, and defendant told him that "he was going to his girlfriend's house in Aurora." When Lankard asked defendant "where he was coming from, [defendant] stated several times he was going to his girlfriend's house in Aurora." When Lankard was asked whether

he "[got] the hint that maybe [defendant] didn't want to tell [him] where he was coming from," Lankard responded: "He seemed more like he was confused on what I was asking. And at one point he asked, he asked me what, as in what I had just asked him." After asking defendant "approximately four times" where he was coming from, defendant told Lankard that "he was coming from his sister's house in Yorkville."

¶ 9    Lankard testified that he asked defendant to step out of the vehicle to perform field sobriety testing. When Lankard was asked his reasons for doing so, he stated: "So those reasons were based off of the statements provided by the caller to KenCom and my own observations of [defendant's] confused speech, his orientation of where he was going and coming from, his inability to answer my questions correctly." He reiterated: "It was based off of the statements made by the caller, [defendant's] confused mannerisms, confusion when asking [defendant] the questions, and sort of slow, you know, speaking mannerisms." When Lankard asked defendant to step out of his vehicle, defendant was not free to leave, due to Lankard's "reasonable suspicion *** that [defendant] was under the influence of an intoxicating substance."

¶ 10    On cross-examination, Lankard testified that KenCom not only advised him that there were "calls coming in about somebody driving all over the road," but also provided him the color and make of the vehicle (a silver Mercedes), its license plate number, and its location. Lankard was advised that the Mercedes (1) "was actually driving off of the roadway," (2) "almost struck a guardrail and a mailbox and was going into oncoming traffic," and (3) "came to a stop off of the roadway on Route 31, and then pulled back onto Route 31 going in a northbound direction." Lankard learned that the person in the Dodge Ram, which he saw parked on the side of the road, was the person who had called 911.

¶ 11    Lankard testified further on cross-examination that he located the Mercedes "on the west side shoulder of Dixon facing southbound." It was a two-lane highway and there was no "artificial lighting." Lankard did not activate his siren or overhead lighting when he parked behind the Mercedes and he did not block the Mercedes in. Lankard activated his rear emergency lights for safety purposes. He used his vehicle's spotlight so that he could see what was in front of him. There were no other officers present when he first approached the Mercedes and his weapon was not drawn. Defendant rolled his window down after Lankard knocked on it. Lankard did not say " 'show me your hands' " or raise his voice. Lankard did not pull out his weapon or put his hands on defendant. Lankard asked defendant where he was coming from, and defendant was not able to answer that question immediately. Defendant continued to look at his phone, and his responses to Lankard's questions were slow. When Lankard was asked what other observations he made about defendant, he testified:

"As far as the slow and confused speech, just general confusion on where he appeared to be going in relation to where his vehicle was actually positioned. Him stating that he was going to Aurora, but he was positioned southbound on Dixon, which would be closer towards if he were driving back to Yorkville or the Bristol area."

When Lankard was speaking with defendant, he believed him to be under the influence. Lankard returned to his vehicle to "run the defendant's information." While doing so, Officer Lauren Buzzard arrived on the scene and parked behind him. When she did so, Lankard turned off his rear emergency lights.

¶ 12    Continuing on cross-examination, Lankard testified that, when he re-approached defendant's vehicle, now joined by Buzzard, he told defendant that someone had called about his driving. Defendant "became agitated and stated that [Lankard] was making it up." Lankard asked

defendant to exit his vehicle and perform field sobriety tests. Defendant agreed to do so. Lankard testified extensively about the field sobriety tests that he conducted, defendant's behavior during the tests, and defendant's performance on the tests. Defendant failed some tests and refused to perform others. Ultimately, Lankard arrested defendant for DUI.

¶ 13    On redirect examination, Lankard testified that, when Buzzard arrived, the emergency lights were activated on her squad car. Before administering the field sobriety tests, Lankard asked defendant if he had any conditions that would make the tests difficult for him, and defendant responded no. Lankard agreed that it would be fair to say that defendant was "uncooperative" throughout his contact with him. Lankard testified that he did not perceive defendant's responses to Lankard's question about where defendant was coming from as a sign that defendant did not want to provide the information. Rather, Lankard testified: "It seemed more that [defendant] was confused by the question, as he also asked me to clarify what I was asking him." Lankard agreed that he was not familiar with defendant's normal rate of speech or demeanor. Lankard testified that he arrested defendant "based off the call, the statements and observations made by [defendant] before asking him to exit the vehicle, and the observations during the field sobriety and non-field sobriety tests." Lankard kept investigating defendant after defendant told him that he was okay because he wanted to make sure that defendant was okay to drive. Lankard had been told that defendant was "[g]oing in and out of his lane into oncoming traffic, almost striking guardrails, other vehicles." Asked why he did not "let [defendant] go when [he] asked [defendant] three times, 'are you okay,' and he indicated he was," Lankard replied, "I didn't advise him that he wasn't free to go. He didn't ask me if he was."

¶ 14     On recross examination, Lankard confirmed that the license plate on the Mercedes matched the number provided on the KenCom call, that the driver matched the description provided, and that the individuals in the Dodge Ram were the individuals who called 911.

¶ 15     Following Lankard's testimony, defendant rested.

¶ 16     The State moved for a directed finding, arguing that a seizure did not occur until after Lankard noticed signs of impairment and asked defendant to step out of the car. At that time, Lankard had reasonable suspicion that defendant was under the influence. Further, the State argued that defendant showed signs of impairment during the field sobriety tests.

¶ 17     In response, defendant argued that he was seized when Lankard first approached his vehicle, because, at that point, he was not free to leave. Defendant also argued that Lankard did not have a reason to ask defendant to perform field sobriety tests, where there was no odor of alcohol or anything observed in the vehicle.

¶ 18     The trial court granted the State's motion. The court found that Lankard was "acting in a community caretaking function" when he stopped behind defendant's vehicle after learning of a 911 call reporting reckless driving over a significant distance. The court noted that the report was not made anonymously and that Lankard located a vehicle matching the caller's description in the area described. The court also found that defendant was not seized at this time, stating that Lankard's use of his lights was reasonable and necessary for his safety. The court then found that Lankard's administration of the field sobriety tests was justified. The court emphasized defendant's initial unawareness of Lankard despite the lights he was shining into the Mercedes, and defendant's slow and confused responses to Lankard's questions. The court concluded:

        "I think that [Lankard's] observations of the defendant, combined with the

              information from the 911 caller, gave him reasonable suspicion of a DUI sufficient to

justify the administration of field sobriety tests. The defendant's performance on those field sobriety tests, which [Lankard] credibly testified regarding, combined with his previous observations, led to probable cause for the defendant's arrest for DUI.

The defendant's petition to rescind and motion to quash are denied at this time. I'll grant the State's motion for a directed finding."

¶ 19    On October 19, 2021, defendant filed a motion to reconsider the denial of his petition to rescind. On November 8, 2021, following arguments, the trial court denied the motion.

¶ 20    Defendant timely appealed from the denial of his petition to rescind and from the denial of his motion to reconsider.

¶ 21                                    II. ANALYSIS

¶ 22    Defendant contends that the trial court should have granted his petition to rescind the summary suspension of his driver's license because he was improperly seized either when Lankard pulled behind him on the side of the road or when Lankard directed him out of his vehicle to perform field sobriety testing. The State responds that defendant was not seized until Lankard directed him out of his vehicle to perform field sobriety testing and that, by that point, Lankard had developed reasonable suspicion that defendant had driven under the influence. The State further argues that, even if defendant had been seized when Lankard first approached defendant's vehicle, the seizure was (1) reasonable under the community-caretaking doctrine or (2) supported by reasonable suspicion based on the 911 call. We agree with the State that defendant was not seized until Lankard directed defendant out of his vehicle to perform field sobriety testing and that, by that point, Lankard had developed reasonable suspicion that defendant had driven under the influence. (Accordingly, we need not address whether Lankard had reasonable suspicion of

criminal activity when he first approached defendant's vehicle or whether any seizure at that time was justified under the community-caretaking doctrine.)

¶ 23 Section 11-501.1(d) of the Illinois Vehicle Code (Code) (625 ILCS 5/11-501.1(d) (West 2020)) provides that if a motorist arrested for DUI refuses to undergo testing, or submits to testing that reveals a blood alcohol level of 0.08 or more, their driving privileges will be summarily suspended. A motorist may request a judicial hearing for the rescission of a statutory summary suspension. *Id.* § 2-118.1(a). The rescission hearing is a civil proceeding. *Id.* In addition to the statutory grounds for rescinding a summary suspension (see *id.* § 2-118.1(b)), a suspension may be rescinded if it resulted from an unconstitutional seizure of the motorist. See *People v. Paige*, 385 Ill. App. 3d 486, 489 (2008); *People v. Wood*, 379 Ill. App. 3d 705, 707 (2008); *People v. Crocker*, 267 Ill. App. 3d 343, 345 (1994).

¶ 24 The motorist bears the burden of proof at the hearing on the petition. *People v. Relwani*, 2019 IL 123385, ¶ 28. If the motorist establishes a *prima facie* case for rescission of the suspension, the burden shifts to the State to present evidence sufficient to maintain the suspension. *Id.* ¶ 17. "In making a *prima facie* case, [the defendant] 'has the primary responsibility for establishing the factual and legal bases' for the requested action." *Id.* (quoting *People v. Brooks*, 2017 IL 121413, ¶ 22). On review of the trial court's ruling, the trial court's findings of fact will not be disturbed unless they are against the manifest weight of the evidence. *Relwani*, 2019 IL 123385 ¶ 18; *People v. Gocmen*, 2018 IL 122388, ¶ 21. However, the trial court's ultimate conclusion as to rescission is reviewed *de novo*. *Relwani*, 2019 IL 123385, ¶ 18; *Gocmen*, 2018 IL 122388, ¶ 21.

¶ 25 The fourth amendment to the United States Constitution protects people against unreasonable searches and seizures. U.S. Const., amend. IV. "Not every police-citizen encounter

results in a seizure." *People v. Smith*, 2016 IL App (3d) 140648, ¶ 28. Our supreme court has recognized "three theoretical tiers of police-citizen encounters":

"The first tier involves an arrest of a citizen, which must be supported by probable cause. [Citations.] The second tier involves a temporary investigative seizure conducted pursuant to *Terry v. Ohio*, 392 U.S. 1 *** (1968). In a '*Terry* stop,' an officer may conduct a brief, investigatory stop of a citizen when the officer has a reasonable, articulable suspicion of criminal activity and such suspicion amounts to more than a mere 'hunch.' [Citations.] The third tier of police-citizen encounters involves those encounters that are consensual. An encounter in this tier involves no coercion or detention and, therefore, does not implicate any fourth amendment interests. [Citations.]" *People v. McDonough*, 239 Ill. 2d 260, 268 (2010).

¶ 26    "[T]he police may approach and question a person seated in a parked vehicle without that encounter being labeled a seizure." *People v. Luedemann*, 222 Ill. 2d 530, 552 (2006). "The encounter becomes a seizure only if the officer, through physical force or show of authority, restrains the liberty of the vehicle's occupant." *Id.* at 552-53; see *Florida v. Bostick*, 501 U.S. 429, 434 (1991). In determining whether a person seated in a parked vehicle is "seized" when a police officer approaches their vehicle and questions them, the appropriate test is whether a reasonable innocent person in the defendant's position would have believed that they were free to decline to answer the officer's questions or otherwise terminate the encounter. *Luedemann*, 222 Ill. 2d at 550-51. "The analysis requires an objective evaluation of the police conduct in question and does not hinge upon the subjective perception of the person involved." *Id.* at 551.

¶ 27    Courts have identified four factors—known as the *Mendenhall* factors—which may indicate the seizure of a person by the police: "(1) the threatening presence of several officers;

(2) the display of a weapon by an officer; (3) some physical touching of the person of the citizen; and (4) the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* at 553 (citing *United States v. Mendenhall*, 446 U.S. 544, 554 (1980)). "The factors illustrate what type of police conduct would give a reasonable person an objective reason to believe that he or she was not free to leave or was not free to decline an officer's requests." *Luedemann*, 222 Ill. 2d at 555. The *Luedemann* court stated as follows about the *Mendenhall* factors:

> "From the very minute the *Mendenhall* factors were created, courts have used their absence to determine that seizures had not occurred.
>
> *** [I]t would seem self-evident that the absence of *Mendenhall* factors, while not necessarily conclusive, is highly instructive. If those factors are absent, that means that only one or two officers approached the defendant, they displayed no weapons, they did not touch the defendant, and they did not use any language or tone of voice indicating that compliance with their requests was compelled. Obviously, a seizure is much less likely to be found when officers approach a person in such an inoffensive manner." *Id.* at 554.

The *Luedemann* court recognized that "[the *Mendenhall*] factors are not exhaustive and that a seizure can be found on the basis of other coercive police behavior that is similar to the *Mendenhall* factors." *Id.* at 557. Other factors "indicative of a seizure of a parked vehicle are 'boxing the car in, approaching it on all sides by many officers, pointing a gun at the suspect and ordering him to place his hands on the steering wheel, or use of flashing lights as a show of authority.' " *Id.* (quoting 4 Wayne R. LaFave, Search and Seizure § 9.4(a), at 434-35 (4th ed. 2004)).

¶ 28 Here, the evidence presented did not indicate that a seizure occurred before Lankard asked defendant to exit his vehicle and perform field sobriety tests. Lankard initially approached

defendant's vehicle alone. Lankard did not display a weapon or physically touch defendant. There was no evidence that Lankard spoke to defendant in anything other than a conversational tone. In addition, Lankard parked behind defendant's vehicle, and there was no evidence that, by doing so, Lankard boxed the car in. There was also no indication that Lankard instructed defendant to place his hands on the steering wheel. Given the absence of any coercive behavior by Lankard, his initial encounter with defendant was consensual.

¶ 29    Nevertheless, relying on *People v. Laake*, 348 Ill. App. 3d 346 (2004), and *People v. Cash*, 396 Ill. App. 3d 931 (2009), defendant argues that he was seized when Lankard pulled behind his vehicle, because "Lankard had activated his rear emergency lights and shined his spotlight into *** defendant's vehicle," which, according to defendant, was "a significant show of authority that restrained [his] liberty." We disagree.

¶ 30    In *Laake*, the police received a tip at about 3 a.m. concerning a possible intoxicated driver. *Laake*, 348 Ill. App. 3d at 347. About 16 minutes later, an officer observed a vehicle parked on the shoulder. *Id.* at 348. The officer pulled his squad car behind the vehicle and turned on the overhead emergency lights. *Id.* The officer's squad car was also "equipped with flashing hazard or warning lights." *Id.* The officer testified that he activated his overhead emergency lights to alert other motorists, as the location was isolated and not well lit. *Id.* In considering whether the defendant was seized when the officer approached his vehicle, the court stated that it was well settled "that a police officer's use of overhead emergency lights, when directed at a particular person, would be interpreted by that person as a command to stay put." *Id.* at 350. The court held that the defendant, at whom the overhead emergency lights were directed, "would have felt compelled to stay put for [the officer's] inquires." *Id.* at 350.

¶ 31    In *Cash*, the police were following a vehicle as part of an ongoing investigation. *Cash*, 396 Ill. App. 3d at 934. They did not have an arrest warrant for the driver or a warrant to search the vehicle. *Id.* At some point, the driver parked the vehicle and the defendant entered. *Id.* Without having observed any traffic, parking, or other violations, an officer pulled behind the vehicle and " 'hit the lights and siren [on his squad car] real quick.' " *Id.* Relying on *Laake*, the court held that an improper seizure occurred when the officer "activated his lights and siren and directed them at [the] parked car." *Id.* at 939-942.

¶ 32    Here, unlike in *Laake* and *Cash*, Lankard did not activate his overhead emergency lights or his siren. Instead, he activated his squad car's rear emergency lights to "advise any oncoming traffic of [the] vehicles off the side of the road." We cannot say that the use of rear emergency lights constitutes a "significant show of authority" as defendant argues.

¶ 33    In addition, although Lankard used a spotlight to illuminate the area in front of his vehicle and carried a flashlight as he approached, it is well settled that this type of conduct is not coercive. See *Luedemann*, 222 Ill. 2d at 561-63 (finding that the officer's act of shining a flashlight on the vehicle as he approached was not "coercive, but *** merely incident to a police officer's performance of his job after dark"). Here, Lankard testified that defendant's vehicle was on the shoulder of a two-lane highway in the late evening hours and that there was no "artificial lighting." Standing alone, Lankard's use of his own lighting—essential to perform his job after dark—did not transform his encounter with defendant into a seizure.

¶ 34    Defendant next contends that, even if his initial encounter with Lankard did not violate his fourth amendment rights, he was improperly seized when Lankard asked him to exit the vehicle and perform field sobriety tests. We disagree.

¶ 35    First, the parties do not dispute that defendant was seized when Lankard asked him to exit his vehicle and perform field sobriety tests. See *People v. Village of Lincolnshire v. Kelly*, 389 Ill. App. 3d 881, 886 (2009) ("There appears to be ample authority to support a holding that submission to field sobriety testing is a seizure under the fourth amendment."). Thus, defendant's seizure had to be supported by reasonable suspicion. *People v. Walter*, 374 Ill. App. 3d 763, 773 (2007). "The test for reasonable suspicion is less exacting than that for probable cause [citation], and even probable cause does not demand a showing that the belief that a suspect has committed a crime be more likely true than false [citation]." *Id.* at 774. "[A]lthough reasonable suspicion demands more than a mere hunch [citation], the standard requires only that 'a police officer must be able to point to specific, articulable facts which, taken together with the rational inferences from those facts, reasonably warrant the intrusion' [citation]." *Village of Lincolnshire v. Kelly*, 389 Ill. App. 3d 881, 887 (2009).

¶ 36    Here, Lankard possessed specific, articulable facts to justify the seizure of defendant for field sobriety testing, based on the information he obtained from KenCom concerning defendant's reckless driving as well as his own observations of defendant when interacting with him.

¶ 37    First, Lankard was entitled to rely on the information obtained from KenCom concerning defendant's reckless driving. As the trial court found, the caller was not anonymous. See *People v. Smulik*, 2012 IL App (2d) 110110, ¶ 7 (recognizing that a tip provided via 911 is not truly anonymous even if the caller does not identify themselves); see also *Navarette v. California*, 572 U.S. 393, 401 (2014) ("The caller's use of the 911 system is therefore one of the relevant circumstances that, taken together, justified the officer's reliance on the information reported in the 911 call."). Lankard was provided with the last known location for a vehicle reported to have been driving recklessly as well as the vehicle's registration number. Shortly after the dispatch,

Lankard located a vehicle, a silver Mercedes, matching the description provided and saw the person who had called 911 in a Dodge Ram parked across from the Mercedes. Thus, when Lankard first approached the vehicle, he had been advised that the vehicle (1) "was actually driving off of the roadway," (2) "almost struck a guardrail and a mailbox and was going into oncoming traffic," and (3) "came to a stop off of the roadway on Route 31, and then pulled back onto Route 31 going in a northbound direction."

¶ 38    In addition to the information obtained concerning defendant's reckless driving, Lankard made his own observations of defendant after approaching defendant's vehicle. Despite Lankard parking his squad car behind defendant on a dark two-way road, illuminating the area with a spotlight directed at defendant's driver's side mirror, and approaching defendant's vehicle carrying a flashlight, defendant was unaware of Lankard standing next to his door until Lankard tapped on his window. When Lankard tapped on the window, "[defendant] kind of almost jerked up." Even if defendant was looking at his phone, either texting or calling someone, the fact that he did not notice Lankard until Lankard tapped on the window provides additional support for the officer's belief that defendant was driving under the influence. Lankard also testified that defendant had "slow and confused speech." When asked where he was going, defendant told Lankard that "he was going to his girlfriend's house in Aurora." However, when Lankard asked defendant "where he was coming from, [defendant] stated several times he was going to his girlfriend's house in Aurora." Lankard testified that defendant "seemed *** like he was confused on what [he] was asking [him]." Lankard had to ask defendant "approximately four times" where he was coming from before defendant told him that "he was coming from his sister's house in Yorkville." Lankard also testified that the direction of defendant's vehicle, facing south, did not correspond with defendant's stated destination of Aurora.

¶ 39    Based on the foregoing, Lankard's request that defendant perform field sobriety testing was supported by reasonable, articulable suspicion that defendant had driven under the influence.

¶ 40                                    III. CONCLUSION

¶ 41    For the reasons stated, we affirm the judgment of the circuit court of Kendall County denying defendant's petition to rescind the summary suspension of his driver's license

¶ 42    Affirmed.