**NOTICE:** This order was filed under Supreme Court Rule 23 and is not precedent except in the limited circumstances allowed under Rule 23(e)(1).

2023 IL App (3d) 220162-U

Order filed October 19, 2023

IN THE

APPELLATE COURT OF ILLINOIS

THIRD DISTRICT

2023

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) ) ) | Appeal from the Circuit Court of the 18th Judicial Circuit, Du Page County, Illinois |
| Plaintiff-Appellee, | ) ) | |
| v. | ) ) | Appeal No. 3-22-0162 Circuit No. 19-CF-40 |
| ALDO SALAS, | ) ) ) | Honorable Ann Celine O'Hallaren Walsh, |
| Defendant-Appellant. | ) | Judge, Presiding. |

JUSTICE ALBRECHT delivered the judgment of the court.
Presiding Justice Holdridge and Justice Peterson concurred in the judgment.

**ORDER**

¶ 1 *Held*: The circuit court erred in denying defendant's motion to suppress evidence.

¶ 2 Defendant, Aldo Salas, appeals his conviction of unlawful possession of a controlled substance with intent to deliver. Defendant argues that the Du Page County circuit court erred in denying his motion to suppress evidence. We reverse.

¶ 3 I. BACKGROUND

¶ 4        On January 29, 2019, the State indicted defendant for unlawful possession of a controlled substance with intent to deliver (720 ILCS 570/401(a)(2)(D) (West 2018)). Defendant filed a motion to suppress evidence on April 30, 2019, which argued that defendant had been illegally seized and searched.

¶ 5        At the July 22, 2019, hearing on the motion to suppress evidence, defendant testified that on January 5, 2019, he and his girlfriend, Ana Martinez, traveled on a train from Arizona to Naperville, Illinois. Seconds after exiting the train, two officers approached defendant, and one began asking questions about "drugs, money and guns." The officers were wearing plain clothing but had badges displayed on their belts. Defendant did not observe any firearms at that time. An officer asked if he could search defendant. Defendant denied permission, stating that they had previously been searched while the train traveled through New Mexico by "[s]ome other agents." The officer began asking more questions and then stated: "Let's take this inside the train station." Defendant testified that he asked the officer why he needed to enter the train station with them. Defendant explained that he and Martinez had already been searched on the train. Defendant indicated that neither officer touched him, but he told the officers twice that he did not want to enter the train station with them. An officer told defendant to "[j]ust, [c]ome on" so defendant felt he had no choice but to comply.

¶ 6        Upon entering the train station, more officers were waiting. Defendant indicated that officers did not ask for permission to search his bags once they were inside the train station. Defendant testified that he and Martinez were separated, and the officers questioned them. Martinez had her luggage, and defendant had his backpack. Officers began searching Martinez's bags and told defendant: "We're going to search you guys and if everything is good, you guys can go." An officer approached defendant and told him to take off his backpack. Defendant felt he had

2

no choice but to comply. Once an officer began searching defendant's backpack, another officer pulled defendant aside and began asking questions about the contents of the bag. Defendant asserted that he did not give permission to officers to search the backpack. Cocaine was discovered inside the backpack.

¶ 7        On cross-examination, defendant indicated that officers had asked for his identification. Defendant provided them with a Florida driver's license with the name Alphonso Gaylord Phillips. Officers did not return the license to defendant. Defendant again indicated that he told officers he did not want to enter the train station with them but felt he had no choice. Defendant admitted that he walked into the station and was not forced or pulled in. Defendant was not handcuffed nor told that he was under arrest. Defendant was not placed in a private room but was directed to a vestibule near the front door. Defendant did not try to retrieve his backpack from the officers once it was in their possession. He testified that there were several officers surrounding him and they had control of his possessions, so he felt that there was nothing he could do about the situation.

¶ 8        Special Agent Torrence Johnson of the Illinois State Police testified that he was a member of the Narcotics and Currency Interdiction Task Force. Johnson testified that he had received information from another agent about two individuals that were traveling on an Amtrak train from Arizona originally headed to Denver, Colorado. That agent indicated that he had interviewed and searched this couple in New Mexico. After the search occurred, the couple changed their destination from Colorado to Naperville, Illinois.

¶ 9        On January 5, 2019, Johnson and other agents from the task force went to the Naperville train station to conduct surveillance on these two passengers. Two individuals exited the train matching the description that had been provided to Johnson. Johnson identified defendant as one of those individuals in open court. Johnson testified that he and Inspector Jason Scott approached

3

them on the train platform. Johnson showed defendant and Martinez his credentials and asked them to enter the train station for an interview. He explained that he told them upon his approach that they were not in any trouble, and he wanted to speak to them inside due to the loud nature of the platform. Johnson indicated that they agreed and never informed him that they did not want to speak with him.

¶ 10    Johnson and Scott walked into the train station with defendant and Martinez. Two other agents were inside the station as they entered. They made a "quick left" and ushered defendant and Martinez to a lobby off the side of the main entrance. Johnson asked defendant for his identification and boarding pass, which defendant produced without issue. They discussed defendant's change in destination and whether he possessed any narcotics. Johnson asked defendant if he could search his backpack. He recounted their conversation:

> "He say, [w]e already been searched. We've been searched before. We clean. And I say, [w]ho searched you before? He said, [w]e were searched before in New Mexico. I said, Okay. Well, were you searched in Illinois? He said no. I said, [w]ell, let's continue on with that. Do you have any illegal narcotics, drugs, any weapons, anything like that in your bag or any large sums of U.S. currency? And he said no."

Johnson indicated that defendant eventually consented to a search of his backpack and had never refused him permission to search.

¶ 11    Johnson described his exchange with defendant as he attempted to obtain defendant's backpack:

> "I noticed that when I asked him about his—if he had anything on his person, on his bag, I noticed that he was gripping the backpack really tight. It was on his back. He was gripping the handles really—He was like white-knuckling it. Then I

4

asked—That's when I said, Are we safe? You know, we're clean. We're clean. We've been searched before. Okay. Well, you're in Illinois. I'm going to have to search your bags, being those items that we mentioned—that I mentioned earlier; weapons, narcotics, any drugs, any dangerous weapons, anything like that. He said okay.

So he handed me his bag."

Johnson indicated that he passed defendant's backpack to Inspector Thomas Barkei to inspect. Johnson searched defendant's luggage while Barkei searched the red backpack. Barkei located a blue Gucci box inside the backpack. When asked what was inside the box, defendant replied that the contents were "something [he] shouldn't have." He later admitted that the box contained 1.5 kilograms of cocaine. Johnson called a canine officer to enter the train station. After the canine alerted on the box, Barkei opened the box revealing a white powdery substance inside. Johnson testified that less than five minutes had elapsed from the time defendant exited the train to the time the cocaine was located in his backpack.

¶ 12        The State admitted the train station surveillance video from the incident and played it in tandem with Johnson's testimony. The video depicted the lobby of the train station. Several members of the public were present in the lobby throughout the video. One officer entered the train station in front of defendant and Martinez and three more officers followed behind them. Defendant and Martinez were ushered to the left of the entrance into an open vestibule. The first officer, Johnson, entered the vestibule. Martinez stayed near the entranceway. Defendant moved further into the corner. Two officers stood behind Martinez, flanking the entranceway. The remaining officer, Inspector Andrew Zakerski, stood in the back of the train station on the right side of the screen. Barkei was standing in the entranceway to the vestibule behind defendant's red

backpack. Scott was behind Martinez in the entranceway of the vestibule, and he was in front of defendant who was off to the left side. Officers searched defendant's luggage and backpack. Barkei removed a box from the red backpack. Approximately six minutes into the video, a canine unit appeared. The State stopped the video prior to the canine's approach to the group.

¶ 13    On cross-examination, defense counsel questioned Johnson about his conversation with defendant while asking for consent to search his bag. The following exchange occurred:

"Q. Now, when you had an interaction with [defendant] and he stated to you that he had already been searched while he was on the train, you indicated, Well, you're in Illinois now and I'm asking if I can do this search now. Correct?

A. Would you consent to a search.

Q. How did you say it?

A. You mind to consent to a search?

Q. And when he said that he had already been searched, how did you respond to him?

A. He said, I've been searched in New Mexico on the train.

Q. Yes. And your response was?

A. Well, you're not on the train. You're in Illinois.

Q. Right. And is that how you said it?

A. I don't know how I said it, but that's particularly what I said."

Upon further questioning, Johnson indicated that he responded to defendant's informing him of the New Mexico search by reiterating that he was in Illinois and speaking with a different officer. When asked why being in a different state made a difference, Johnson stated: "Consensual. I'm

not Officer Perry. I'm not Special Agent Perry." Johnson denied having told defendant "you're not on the train now."

¶ 14 Scott's testimony corroborated Johnson's version of the encounter. Scott explained that while Johnson was searching defendant's luggage, defendant was fixated on the luggage and began to move closer to Johnson. Accordingly, Scott moved over to defendant's luggage, pulled defendant aside, and asked to "speak to him over there," which Scott indicated was two to three feet away from Johnson. Scott engaged defendant with simple questions while the search occurred. Scott indicated that defendant was standing in front of him and "then there was a long, narrow hallway *** and there's another set of double doors that you can go. So there was nobody there standing or prohibiting his exit." Scott denied asking defendant questions to distract him from revoking his consent to the search. Scott asked defendant what he was worried about and how much he had. Defendant responded that he had 1.5 kilograms of cocaine. At the same time, Barkei located the blue Gucci box containing the white powdery substance.

¶ 15 In deciding the motion, the court found that there was no probable cause or reasonable articulable suspicion to stop defendant. Discussing voluntary consent, the court stated:

"I know the defendant says no to the search, according to his testimony, because they were searched in New Mexico. *** So at some point the defendant questions the need for a search because I've already been searched in New Mexico. But Officer Johnson says, Well, this is Illinois, or words to that effect, and can we go inside here? You know, it's a little loud out here.

The defendant goes inside. There's no suggestion that he's ever touched; that he's ever ordered inside; that any weapons [were] ever displayed. I don't believe a reasonably innocent person would feel that they have to do this. The

7

defendant accompanies the officers inside, and the testimony is that he consented to a search and never said no.

Looking at the video, it's clear they are directed to the left as they enter the train station. It's a wide open public area. There are individuals coming and going and waiting for whatever trains are in play in that particular station. You can't really see that well what's happening, but it certainly is not inconsistent with the testimony of the officers.

And even looking at the defendant's statement, I don't read the defendant saying no except arguably out on the platform and not inside the station. \*\*\*

So I believe the encounter at the station, the invitation back into the train station which the defendant acquiesces in, and ultimately the search of his backpack all appears to this Court's perspective to be consensual."

In other words, the court found that a reasonable person would not feel like he was compelled to comply in the absence of weapons or physical touching. Where the court found no evidence that defendant had refused officers once inside the train station, it ultimately found defendant's acquiescence in entering the train station and the search of his backpack to be consensual. The court denied defendant's motion to suppress evidence.

¶ 16    Defendant was convicted of unlawful possession of a controlled substance with intent to deliver following a three-day jury trial. During trial, Johnson was a key witness for the State. Relevant to this appeal, when asked by the State whether Johnson obtained consent to search defendant, the following colloquy occurred:

"Q. Now, going back to you asking to search his bags, can you tell the jury about that conversation?

8

A. Me asking to search it?

Q. Yes.

A. Oh, when I asked to inspect his luggage for those items that I mentioned, that's when he mentioned that, you know, he was searched already. He was searched prior to me meeting him. You know, I went on that—

Q. Did you ask him for consent to search?

A. I did. I did.

Q. And what happened?

A. He gave me—He complied to my consent and now I had consent to search his luggage.

Q. And can you tell the jury what you did after the Defendant gave you permission to search his bags?

A. I asked for his red—That's when I asked for his red backpack.

Q. What happened with the red backpack?

A. That's when I can say he—he clenched it and I said, I'm going to need to search your—Can I search your red backpack for the items? He handed me the red backpack. I gave the red backpack to Inspector Barkei."

On cross-examination, Johnson indicated that he did not know if he used the words "I'm going to need to search" defendant's backpack but if he did, he was responding to a statement that defendant had made and "[he would] have to know what that statement was that [defendant] made for [him] to allegedly make that comment."

¶ 17        Defense counsel filed a new motion to suppress midtrial, which was denied. On April 5, 2022, defendant filed, *inter alia*, a motion to reconsider the denials of both the original and midtrial

motions to suppress evidence. The posttrial motions were denied. Defendant was sentenced to 15 years' imprisonment. Defendant appeals.

¶ 18                                    II. ANALYSIS

¶ 19          On appeal, defendant argues that the circuit court erred in denying his motion to suppress evidence as he was seized without reasonable suspicion or probable cause, during which time a nonconsensual search of his backpack occurred. Defendant further contends that, under the exclusionary rule, this court should suppress the evidence obtained during this unreasonable search and seizure and reverse his conviction outright.

¶ 20          When reviewing a court's ruling on a motion to suppress evidence, we apply a two-prong standard of review. *People v. Luedemann*, 222 Ill. 2d 530, 542 (2006). The court's findings of fact are afforded great deference, and we will reverse only where those findings are contrary to the manifest weight of the evidence. *Id.* However, as the decision of whether suppression is warranted constitutes a question of law, we review the court's ultimate ruling *de novo*. *People v. Lee*, 2018 IL App (3d) 170209, ¶ 20.

¶ 21          Both the United States and Illinois Constitutions protect individuals from unreasonable searches and seizures. U.S. Const., amend. IV; Ill. Const. 1970, art. I, § 6. However, "[n]ot every police-citizen encounter results in a seizure." *People v. Smith*, 2016 IL App (3d) 140648, ¶ 28.

> "Courts have divided police-citizen encounters into three tiers: (1) arrests, which must be supported by probable cause; (2) brief investigative detentions, or '*Terry* stops,' which must be supported by a reasonable, articulable suspicion of criminal activity; and (3) encounters that involve no coercion or detention and thus do not implicate fourth amendment interests." *Luedemann*, 222 Ill. 2d at 544.

¶ 22    The parties' arguments focus on the third type of encounter, a consensual encounter. Defendant contends that he was unreasonably seized when he felt compelled to continue interacting with police due to the coercive nature of their actions. It is well-settled that mere police questioning, if the person approached is willing to listen or answer, does not constitute a seizure. *Florida v. Bostick*, 501 U.S. 429, 434 (1991). Even where an officer has no basis for suspecting a particular individual, he or she may generally ask questions of them, request their identification, or request consent to search. *Id.* at 434-35.

¶ 23    When assessing the voluntariness of an individual's consent, we must examine the totality of the circumstances. *People v. Graf*, 265 Ill. App. 3d 746, 750 (1994). "Consent is *not* voluntary when it is solely the product of acquiescence or submission to the assertion of lawful police authority." (Emphasis in original.) *People v. Cardenas*, 237 Ill. App. 3d 584, 588 (1992). An initial refusal to consent is an important factor in determining whether later consent is voluntary. *People v. Wall*, 2016 IL App (5th) 140596, ¶ 15.

¶ 24    Generally, for the purposes of the fourth amendment, a person is seized when "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Mendenhall*, 446 U.S. 544, 554 (1980). Factors which are indicative of a seizure include "the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled." *Id.* This list of factors is not exhaustive, and a seizure may be found based on other, similarly coercive police conduct. *People v. Cosby*, 231 Ill. 2d 262, 281 (2008).

¶ 25    Here, we find the circumstances sufficient to constitute a seizure. Upon exiting the train, defendant was immediately approached by Johnson and Scott. Johnson escorted defendant into the

11

train station and directed him into a small vestibule on the left. Three officers followed defendant into the train station. Scott and Barkei advanced and flanked the entrance of the crowded vestibule where defendant was questioned. Zakerski moved to the back of the train station. Johnson stood in front of defendant who was off to the side in the corner of the vestibule. Scott stood behind Martinez. This positioning, as depicted on the surveillance video and through Johnson's testimony, demonstrates that defendant was effectively surrounded by officers from the time of his entrance into the train station and would need to push past officers to leave the cramped area.

¶ 26        When asked for consent to search his bags, defendant implicitly denied permission when he responded that the bags had already been searched. Johnson retorted that he was "going to have to search [his] bags." Under these circumstances, a reasonable person, having their attempts to refuse officers met with an authoritative statement that officers would need to search the backpack regardless of that refusal, would not feel free to then push past those officers and leave the train station. Accordingly, defendant was unlawfully seized.

¶ 27        When police violate a defendant's constitutional rights, that violation is referred to as a "poisonous tree." *People v. McCauley*, 163 Ill. 2d 414, 448 (1994). "[A]ny evidence which the State obtains by exploiting that constitutional violation is subject to suppression as the 'fruit' of that poisonous tree." *Id.* However, "evidence which comes to light through a chain of causation that began with an illegal seizure is not *per se* inadmissible." *People v. Henderson*, 2013 IL 114040, ¶ 34. A reviewing court should consider " 'whether the chain of causation proceeding from the unlawful conduct has become so attenuated or has been interrupted by some intervening circumstance so as to remove the "taint" imposed upon that evidence by the original illegality.' " *Id.* ¶ 33 (quoting *United States v. Crews*, 445 U.S. 463, 471 (1980)).

¶ 28　　　　In this case, defendant was unlawfully seized and searched contemporaneously. The entire exchange lasted approximately five minutes from Johnson's initial contact with defendant to the location of the cocaine. Defendant made no incriminating statements prior to his unlawful seizure, and no intervening event occurred to remove the taint imposed from the original illegality. Thus, the court erred in denying defendant's motion to suppress evidence.

¶ 29　　　　Without the evidence that was improperly obtained, the State cannot prove the charge of unlawful possession of a controlled substance with intent to deliver. Accordingly, we reverse defendant's conviction. See *People v. Jackson*, 2022 IL App (3d) 190621, ¶ 24; *People v. Eubanks*, 2019 IL 123525, ¶ 100 ("Because the State cannot prove the aggravated DUI charge without that evidence, we affirm the appellate court's judgment reversing that conviction outright.").

¶ 30　　　　　　　　　　　　　　　　III. CONCLUSION

¶ 31　　　　The judgment of the circuit court of Du Page County is reversed.

¶ 32　　　　Reversed.